[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a Memorandum of Decision in a foreclosure action that was tried to the court.
 PROCEDURAL ASPECTS
On May 19, 1995, the plaintiff commenced this foreclosure action on the then unpaid balance of an underlying note in the amount of $1,907,384.63. The defendant filed an answer, special defenses and counterclaims. The matter was tried to the court. After trial, judgment was rendered for the defendants on August 5, 1997. The memorandum of decision concluded that the plaintiff had not proven the amount of the indebtedness at the time that the loan was assigned from the original mortgagee. The trial court did not address the merits of the defendant's special defenses and counterclaims. The Plaintiff appealed to the Appellate Court, and the appeal was transferred to the Supreme Court pursuant to Connecticut General Statutes § 51-199(c) and P.B. § 65-1. Invoking both the party admission rule and the business record exception to the hearsay rule, the Supreme Court reversed the decision of the trial court on September 1, 1998. Willow Funding Company, L.P. v. Grencom Associates,246 Conn. 615 (1998).
The case was remanded to the Superior Court for a new trial. The trial of this matter was assigned to this court by the Presiding Judge, Civil, since this court was not the trial judge in the first decision. "No judge of any court who tried a case without a jury in which a new trial is granted, or in which the judgment is reversed by the Supreme Court, may again try the case." General Statutes § 51-183c.
 GENERAL FACTS
After hearing the evidence and testimony and reviewing the CT Page 829 exhibits in the trial before this court, this court finds that the statement of facts contained in the summary of the Supreme Court decision is accurate and finds the following facts:
"This case arises out of successive assignments of a mortgage debt. On June 13, 1988, the named defendant, Grencom Associates (Grencom), executed a note for $1,500,000, payable to Citytrust. The note was secured by a second mortgage on real estate in Greenwich. The defendants Arthur Collins and Arthur D. Emil, became guarantors of Grencom's debt. The defendants did not repay the loan when it matured on June 15, 1991. Shortly afterward, Citytrust failed, and the Federal Deposit Insurance Corporation (FDIC) became its receiver. The FDIC hired Consolidated Asset Recovery Corporation (CARC) to service the Grencom loan. The plaintiff, Willow Funding Company, L.P., purchased the loan under sealed bid as part of a pool of loans. Accordingly, on December 6, 1994, the FDIC endorsed the note and assigned the mortgage to the plaintiff." Willow Funding Co. v. Grencom Associates, supra,246 Conn. 617-18.
The Supreme Court also concluded that Grencom made admissions in various documents provided by them to accountants as well as in public filings. These admissions established that their debt to Citytrust as of the time of the FDIC's acquisition of the mortgage was $1,423,989.71. Id. 621-22. "We conclude that the trial court was required to conclude that the defendants' admissions sufficed to satisfy the plaintiff's burden of proof with respect to the defendants' indebtedness." Id 623. "The defendants' admissions provided sufficient evidence that $1,423,989.71 was the amount of the defendants' indebtedness at the time of the FDIC's acquisition of the mortgage." Id. 624
 PLEADINGS
On May 19, 1995, the plaintiff, Willow Funding Company L.P, (Willow) commenced this litigation in three counts: (1) Foreclosure of the $1,500,000 Citytrust mortgage against the owner of the property, Grencom Associates, a Connecticut Limited Partnership; (2) Claims against Arthur Collins and Arthur D. Emil on their guarantees on the underlying $1,500,000 Citytrust mortgage; and (3) Equitable relief against Grencom for its failure to assemble the collateral upon the request of the plaintiff. In essence, the plaintiff proceeded on the first count of the complaint seeking a foreclosure of the $1,500,000 Citytrust mortgage. This count claimed that there was a first CT Page 830 mortgage on the property in the face amount of $2,625,000 to Equitable Life Assurance Society of the United States. This first mortgage is and was at all times current, not in default nor under foreclosure. The only other prior encumbrances are real estate taxes due to the Town of Greenwich. During the litigation they had fallen in arrears, but by the time of trial, Grencom was current on the real estate taxes. The plaintiff proceeded in foreclosure in its own name. Dime Savings Bank of Wallingford v.Arpaia, 55 Conn. App. 180, 184 (1999).
The defendant filed a number special defenses and counterclaims seeking the following findings and/or remedies:
 1. The plaintiff should be denied a remedy due to its unclean hands.
2. The plaintiff breached its fiduciary duty to Grencom.
 3. The plaintiff violated its duty of loyalty by usurping Grencom's business opportunity.
 4. The plaintiff breached its implied covenant of good faith and fair dealing with Grencom.
 5. The plaintiff violated its duty of loyalty by failing to disclose its self interest.
 6. The plaintiff violated its duty of loyalty by withdrawing from the joint venture in order to pursue for its own account the opportunity of the venture.
 7. The plaintiff failed to prove fair dealing by clear, convincing and unequivocal evidence.
 8. This court may withhold foreclosure or reduce the indebtedness using equitable considerations.
9. This court may impose a constructive trust on the mortgage.
10. The plaintiff owes a duty of accounting to Grencom.
 11. The defendant seeks punitive damages and attorneys' fees from the plaintiff.
These Special Defenses and Counterclaims were denied by the CT Page 831 plaintiff and the matter proceeded to trial before this court.
 FURTHER FACTS FOUND
This court finds the following facts: Grencom Associates, L.P. is a partnership and its only two partners are Arthur Collins and Arthur D. Emil. Grencom Associates, L.P. purchased the 2.2. acres of land at 1445-1455 East Putnam Avenue, Greenwich, CT in the early 1970's and constructed two commercial office buildings with a total 40,000 square feet. Since its construction, Grencom has consistently owned and managed the property. A portion of one building is occupied by the real estate venture of Collins and Emil. The remaining portions of the two buildings are rented to third party commercial tenants. The 1978 $2,625,000 first mortgage to Equitable Life Assurance Society of the United States has a principal balance due of less than $1,800,000 and at all times has been current. The exact balance of the existing first mortgage is not relevant to the issues at trial. The first mortgage is not now nor has it ever been in default. The real estate taxes to the Town of Greenwich are current. There are no other encumbrances that have priority to the subject second mortgage. Grencom obtained a loan in the amount of $1,500,000 from Citytrust on June 13, 1988, which was secured by a second mortgage an the entire premises. The second mortgage note was guaranteed by Collins and Emil as to interest and late charges only. (Exhibits 1-5.) Citytrust was taken over by the Federal Deposit Insurance Corporation (FDIC) on June 15, 1993. The amount of the mortgage indebtedness owed by Grencom to Citytrust on the date that the FDIC took over the Citytrust mortgage was $1,423,989.71. This amount is shown on the tax returns, ledger sheets and other records of the plaintiff. Ferris v. PolycastTechnology Corp. , 180 Conn. 199, 204 (1980). In order to service the mortgages of the failed Citytrust, the FDIC appointed Consolidated Asset Recovery Corp (CARC) as their servicer. At all times after the takeover FDIC was the holder of the mortgage, not CARC. At no time after June 15, 1993 did Grencom make any payments on the note to any entity. In the fall of 1994 Arthur Collins, alone, on behalf of Grencom, arranged with CARC for a reduction of the total indebtedness as follows: the amount of principal, unpaid accrued interest, late charges and release from guarantees and the mortgage could be satisfied for the payment of $500,000 lump sum cash (Exhibit 26).
Grencom was able to obtain from CARC a number of extensions of this reduction payment. No one from CARC testified that the CT Page 832 extension was to expire on October 15, 1994. There was no evidence to indicate that CARC would not have done the $500,000 reduction deal on October 31, 1994. The last extension was due to expire October 31, 1994. (Exhibits 26, 29 30). The extension to October 31, 1994 was based on a per diem payment due by Collins and, as in the past, could be paid in arrears to CARC. This was confirmed by the testimony of counsel for CARC saying that the last day the Grencom loan could be pulled from the loan package was November 4, 1994. In fact, three other loans were pulled in the late fall of 1994 from this very loan package. Exhibit 15.
Willow Funding, LLC, was introduced to Grencom by a mutual friend, William Stern. Collins and Emil had a long standing favorable business relationship with Stern. Stern was more familiar with the commercial mortgage field than Collins or Emil. Prior to the introduction, the plaintiff had no notice or knowledge of the Grencom Citytrust mortgage or the fact that there was a lump sum settlement with CARC for $500,000. Grencom sought an introduction through Stern in order to obtain funds from Willow to buy out CARC for $500,000. Grencom needed additional cash to make improvements to the buildings and further funds to pay any interest and/or finder's fee due Willow for this transaction. At the time of these negotiations, Grencom knew that the Citytrust mortgage was going to be sold at a future public auction to a high bidding unknown third party, if Grencom did not pay CARC the $500,000. According to 12 U.S.C. § 1821(p) the original borrower, Grencom, Collins and Emil, were ineligible to bid at the public auction. Grencom had the October 31, 1994 deadline to accomplish this refinance and $500,000 payoff.
Grencom provided Willow with a substantial amount of financial, lease and property information, almost all of which would not be known to the general public or contained in CARC's or Citytrust's files. Willow obtained directly from Grencom all the information it needed to make an underwriting determination in order to make the loan. This included financial information, historical operation data, pro forma projections of operating data, summary of leases, summary of lease escalations, projections of lease payments on a going forward basis, future lease negotiations, capital improvement estimates and projections years ahead as to new leases and lease escalations. In addition, Willow inspected the property, inside and out and discussed the future lease arrangements with Collins. An agreement was reached in which Willow agreed to advance the sum of $865,000 to Grencom, secured by a new second mortgage on the property, $500,000 would be paid CT Page 833 to CARC for the assignment of the original Citytrust loan to Willow and this $1,500,000 second mortgage would be released by Willow who would then hold a new second mortgage in the amount of $865,000. Willow would advance $200,000 in new funds to Grencom for building improvements and the remaining $165,000 would be an equity payment by Grencom to Willow amortized over the period of the new $865,000 second mortgage. The parties referred to this $165,000 as "vig". This agreement was reached by the parties in late September 1994. Willow requested that Grencom pay $5000 for Willow's attorney's fees and costs in preparing the transaction documents for this new $865,000 second mortgage. On October 3, 1994, Grencom paid the requested $5000. As a result of this agreement and the Stern introduction, Grencom and its partners trusted Willow.
At the time that the $865,000 agreement was reached, Grencom through its two individual partners, Collins and Emil, indicated that they were not willing to personally guarantee the $865,000 loan. It was agreed by all parties prior to October 3, 1994 that Collins and Emil would sign a limited form of personal guarantee referred to as "spring back guarantee." The parties understood that the "spring back guarantee" would be signed personally by Collins and Emil, but would exclude the two guarantors from any liability if upon default of the $865,000 second mortgage, Grencom would execute a deed in lieu of foreclosure, not contest any foreclosure action nor file for bankruptcy. Collins and Emil agreed to this form of "spring back guarantee" and thereafter paid the $5,000 attorney's fees. The court finds that an agreement was reached between the parties as to the terms of the loan and guarantees on October 3, 1994, the date of the payment by Grencom of the $5000 attorney's fees and its acceptance by Willow. Willow nearly concedes this point at page 26 of Plaintiff's Reply Memorandum, dated April 30, 1999; "Willow does not dispute that there was an understanding on enough of the deal to proceed further."
Arthur Beckerman, who negotiated the transaction for the plaintiff, testified to the following as to his understanding of the "spring back guarantee." "If the borrowers were to turnover the real estate to us free and clear of any and all liens and encumbrances, then their guarantee would disappear." He further testified: Q. "It was your basic understanding that if the loan went into default and if the obligors were to give you a deed in lieu of foreclosure and not stand in the way of your taking possession of the property, that was the scope and limitation of CT Page 834 the `spring back guarantee?" To this question Mr. Beckerman answered "Yes". This testimony confirms this court's finding that the parties had reached an agreement on the terms of the "spring back guarantee".
Despite the $5000 payment and Grencom's request to prepare the closing documents, Willow did not prepare any closing documents, guarantee or mortgage. By fax of October 21, 1994 a document entitled "Rider" was sent to Collins. It was a rider to a guarantee. No other loan or mortgage documents were sent to Grencom, Collins or Emil. The initial underlying "spring back guarantee" was not enclosed nor were the terms of the guarantee set forth in the rider or the accompanying fax cover sheet. This rider required Collins and Emil to pay any real estate taxes that were then owed on the property, cure all defaults in the $865,000 second mortgage including all interest and principal payments due to Willow, to pay all liens on the property and obtain releases therefore, to pay any outstanding invoices for operating expenses and all of Willow's attorney's fees to date, all prior to deeding the property over to Willow. According to the rider, all these events would have to occur in order to free Collins and Emil from any personal obligations on their "spring back guarantees." Emil testified that the rider would require them to pay the current first mortgage in full to Equitable Life Assurance Society. The court disagrees with Emil's conclusion. In any event, this court concludes that Willow's October, 1994 rider to the "spring back guarantee" contained terms and conditions that were different and more onerous to Grencom than that of the original agreement reached on October 3, 1994. Willow had changed the agreed upon deal. Time was still of the essence and the October 31, 1994 deadline was fast approaching.
Collins called Beckerman daily after October 4, 1994 to obtain the loan papers. Unknown to the defendants, Willow's attorneys, Herricks Feinstein, had prepared the rider on October 12, 1994 sent it interoffice to Kalikow and Beckerman of Willow Funding, L.P. marked "By Hand". Exhibit G. The attorneys sent a copy of the rider to Stern on October 15, 1994. Stern did not forward the rider to the defendants. The attorneys did not send the rider to Grencom, Collins or Emil. On October 21, 1994 Beckerman faxed a copy of the rider to Collins, (Exhibit F), which the defendants received in the late afternoon Friday, October 21, 1994. The fax is dated Friday, October 21, 1994 at 17:54, well after normal business hours Exhibit I. This was the first time Grencom, Collins or Emil received any second mortgage loan documents from CT Page 835 Willow or its attorneys. The evidence shows two different fax forms used by Willow. Exhibits F and I. Exhibit F adds the word "Guarantee" to the fax cover sheet language of Exhibit I. No such guarantee was ever sent with either of the two faxes. No such guarantee was ever sent by any person or entity to Grencom, Collins or Emil. The plaintiff's attorneys did not testify. The October 12, 1994 letter (Exhibit G) refers to a promissory note, open end mortgage deed, security agreement and guaranty. No copies of the proposed $865,000 second mortgage deed or note, nor other closing documents were offered into evidence. The Beckerman fax calls for immediate action, yet there was no explanation of the 9 day delay. The court can only infer that these other closing documents were never prepared by Willow's attorneys even though they had been paid $5000 on October 3, 1994. Willow and their attorneys failed to prepare and/or send to the defendants the closing documents even though they knew time was of the essence. Kalikow had been working on changes in the guarantee. Exhibit H, in Kalikows handwriting on a letter dated September 12, 1994, provides "P.G. interest guarantee." P.G. means personal guarantee.
The parties attempted to renegotiate acceptable terms to resolve the guarantee and rider. Other than the letter with the rider, no guarantee or other closing documents were received by Collins from Willow on the late afternoon of Friday October 21, 1994. No other documents were forwarded to Grencom. At no time, either before or after, did anyone from Grencom receive a copy of a proposed note, mortgage, guarantee or any of the other closing documents other than this disputed rider. On Monday, October 24, 1994, Collins and Emil discussed the terms of the rider and attempted that day to contact Beckerman. Beckerman was not available. Stern had been copied into the correspondence. On October 25, 1994, a telephone conversation took place with Mr. Beckerman in which he, on behalf of Willow, refused to modify the rider so that it would be consistent with the early agreement as to the content and scope of the spring back guarantee, claiming that their attorneys would not allow them to make certain alterations.
At that time, Grencom had no knowledge that it was the ordinary course of Willow to purchase from the FDIC and other governmental agencies, defaulted mortgages issued by failed banks. This in fact had been one of Willow's major sources of business. Although Collins and Emil were sophisticated real estate investors there was no evidence that they were experienced in dealing with failed CT Page 836 banks and public auctions. Collins and Emil were amateurs compared with Willow's professional experience in the field in question. In the last telephone conversation, October 25, 1994, four business days before the extension by CARC would expire, Collins furnished to Willow the name and address of his contact CARC. This was in response to Beckerman's request, "Would it be OK for us to call CARC?" Beckerman requested the CARC contact, Collins did not volunteer the information until Beckerman's request. Beckerman initiated the request, not Collins. Collins was still in daily contact with CARC all through October 1994. Beckerman told Collins on October 25, 1994, "We want to continue conversation with CARC." At no time during that telephone conversation or any other time, before or after, did Willow advise Grencom that it intended to proceed, or in fact was proceeding, on its own account. Willow at no time told Grencom it would be bidding at the public auction on its own account on the Citytrust mortgage. Willow never told Grencom that if it acquired the Citytrust mortgage it would not abide by the $865,000 deal previously agreed to with Grencom. Collins did assume that if Willow contacted CARC in order to purchase the Citytrust mortgage, that the agreed upon $865,000 second mortgage transaction would be in full force and in effect, including the agreed upon terms of the "spring back guarantee." Willow had never advised him otherwise. This is sufficient for Collins to rely on the fact that Willow would do the $865,000 deal after the auction. The court finds that Collin's assumption was reasonable and credible.
A memo from Stern, (Exhibit D, document A), contains the following: "Collins called me after hearing that Kalikow won and asked if Kalikow wanted title by immediately foreclosing or would he consider again making the loan." Beckerman, without Stern's authority, made line out changes to this memo. This memo was actually drafted by Beckerman and typed outside of Stern's presence under Beckerman's direct supervision. This court finds that Stern called Kalikow. Stern was mad because Kalikow changed the deal. Stern said Kalikow refused to give in and demanded the entire loan from Grencom. This court credits the Stern video testimony at trial over anything contained in the memo, (Exhibit D, document A).
On October 26, 1994, the day after the telephone conversation, Willow contacted CARC and requested a 14 page bid package and access to CARC's files. Beckerman had to sign a confidentiality agreement with CARC prior to receiving the bid package. Exhibit CT Page 837 14 The confidentiality agreement provided, "Without the prior written consent of FDIC, Bidder shall not, directly or indirectly, contact, seek or attempt to seek any information from any person other than FDIC regarding the loans or the Evaluation Material." David H. Struss, former counsel of CARC, likened this confidentiality agreement as entering into a fiduciary duty. The court finds this characterization credible. There was no evidence of such FDIC consent for Willow to obtain other information. In fact, Willow did obtain extensive information directly from the defendants in violation of this confidentiality agreement. Ms. Jodi Breitbart on behalf of Willow proceeded to perform due diligence on a pool of loans in order to formulate and submit a bid to CARC.
The auction is conducted by sealed bids. A package of various loans is selected by CARC. CARC will not entertain any bids on a single loan in a package of loans, The high bidder of the sealed bid wins all the loans that are in the package. Once a loan sale closes, nothing would prevent Willow from agreeing with Grencom on a restructure or reconfiguration of its $1,500,000 loan. Willow had no restrictions on what it could do with that asset after the CARC to Willow sale closed.
The initial pool contained a number of other loans in addition to the Grencom loan. At the time of the bid there were only three loans in the bid pool. Willow was the successful bidder at the public auction and paid $645,000 to CARC for a pool of three loans. Willow was assigned the Grencom mortgage by the FDIC on December 6, 1994. Exhibit 13. The first loan on a Syracuse, New York property (debtor W. Warren Street Associates, Elmen Investors, Inc.) resulted in Willow receiving $60,000. The second loan on a Fairfield, Connecticut property (debtor S. Richard Whittier) resulted in Willow receiving $198,845.66. CARC also furnished Willow a rebate of $3,496.08. The third loan was the $1,500,000 Citytrust second mortgage on the Grencom property. This court finds that the net investment that Willow has in Grencom Citytrust mortgage is $382,658.26. Willow still holds the note and the mortgage pursuant to the FDIC assignment. Exhibit1-5 and 13. Willow did not bid on any other pool of loans other than the one containing the Grencom mortgage. Willow had no internal files on the other two loans. They had an internal file on only the Grencom loan.
The fact that Willow paid $382,658.26 for a mortgage that it is now seeking to foreclose for well over $2,000,000 is irrelevant CT Page 838 to any findings of facts, conclusions of law or exercise of equitable powers this court may make. Willow is entitled to seek full payment from Grencom on the entire principal, interest, late fees and attorney fees on the $1,500,000 Citytrust note despite the fact that Willow purchased the note at a substantial discount. This court has not considered the amount Willow paid for the Grencom mortgage in any part of its decision. UMLIC-WFinding Corp. v. Elshazly, Superior Court, Judicial District of Stamford/Norwalk, Docket No. CV 94-0138920 S (November 9, 1995, Hickey, J.) "The amount paid by the plaintiff for the assignment is irrelevant to a determination of the rights assigned." Leonardv. Bailwitz, 148 Conn. 8, 13 (1960); Southbridge Associates, LLCv. Carafalo, 53 Conn. App. 11, 19-20 (1999); Connecticut NationalBank v. Marland, Superior Court, judicial district of New Haven at Meriden, Docket No. CV 95-0249406 S (October 29, 1996, Dorsey, J.)
After the conclusion of the bidding Willow purchased these three loans during November 1994. Neither Grencom nor Willow contacted each other until December 1994. Breitbart contacted Collins and Emil and a meeting was held. At the December 1994 meeting Breitbart refused to fulfill the $865,000 agreement. She made an offer on behalf of Willow that assumed that the full amount of principal that Citytrust had on its books, $1,438,865.72 plus accrued interest, would be paid off by Grencom over three years with negotiated terms. Emil, when he heard this offer, commented: "Miss Breibart, there is zero chance in a thousand we would do that deal. We want our old deal." He then immediately paraphrased Justice Cordoza. "You have a fiduciary duty to us and you have violated it: It is a punctilo of an honor most sensitive." Willow made a formal demand for payment by Grencom on April 12, 1995. Exhibit 31 No payment was made and this foreclosure action was commenced by a writ, summons and complaint dated May 19, 1995.
Stern testified that he called Richard Kalikow shortly thereafter at Collin's insistence. "Q. Yes, After you found out that Kalikow had acquired the mortgage and after you found out that Kalikow was not willing to do the deal at the pricing points that had previously been negotiated? A. Right, I told Richie not only was he wrong, he went back on his word . . ." This court finds Stern's conclusion as to Kalikow's actions credible and that in fact there was a deal and Willow changed the terms unilaterally. CT Page 839
 FINDINGS AS TO DEBT
From the documents offered in this trial, the testimony in this trial, as well as the Supreme Court findings and the admissions of Grencom, this court finds that the amount due by Grencom on the Citytrust note as of June 15, 1993, the date of the FDIC take over, is $1,423,989.71. Ferris v. Polycast TechnologyCorporation, supra, 180 Conn. 204. The interest is in arrears according to the note and thus the past month's interest would be due in addition to future interest and late charges. There was no evidence of any payments of principal or interest made after June 15, 1993 or of any other credits due the defendants. The next date for payment of interest on the note was June 15, 1993 in arrears. Exhibit 1, 15 and 17
The parties were in dispute as to the rate of interest on that principal amount. The interest calculation language of the Citytrust note is as follows: "thereafter, said interest rate shall be adjusted annually to a rate of interest equal to three hundred seventy-five (375) basis points above the current (1) one year Weekly Average Treasury Index (Statistical Release H. 15), as correctly published in the Wall Street Journal. The rate shall be calculated as of the last full calendar month, ending no less than thirty (30) days prior to the anniversary date." Exhibit 1 The note contains no separate default interest rate. The court finds that no such weekly index is published in the Wall Street Journal. There was no evidence that the Wall Street Journal did not publish such an index at the date of the note in June 1988 and for years thereafter. Statistical Release H.15 (519) was offered into evidence as Exhibit 45. The parties were in dispute as to whether Statistical Release H.15 (519) was an "index" or just a list of interest rates. Also in dispute was which column or line of Statistical Release H.15 (519) would be utilized. The parties disputed the method of calculation of the formula as to "the last full calendar month, ending no less than thirty (30) days prior to the anniversary date." Finally the defendant claims that the plaintiff has not satisfied its burden of proof as to a quantifable method of proving the interest in accordance with the terms of the note. The defendant states that the plaintiff must prove "the interest charged consistent with the contract pay rate." The parties have stipulated that the interest rate charged was commercially reasonable. Exhibit 47
The court finds that according to the interest formula, the "anniversary date" is the date of the note. Although the CT Page 840 $1,500,000 note is dated June 13, 1988, the note states, "Principal and interest shall be payable as follows: commencing July 15, 1998 and continuing on the fifteenth (15th) day of each month thereafter through and including the installments due July 15, 1989 . . ." The "anniversary date" is each June 15th. The correct date for commencing this "anniversary date" is June 15, 1993. The phrase beginning with "rate shall be calculated" refers to April 1993 which is "the last, full calendar month, ending no less than thirty (30) days prior to the anniversary date."
As to those issues the court required the parties to brief the law of "failed index." Central Bank v. Colonial RomanelliAssociates, 38 Conn. App. 575, 578 (1995); Mechanics and FarmersSavings Bank, FSB v. Delco Development Co., 232 Conn. 594, 597-98
(1995); Federal Deposit Insurance Corporation v. Keating,44 Conn. App. 556, 560 (1997). In response to this request by the court and in lieu of evidence of an alternate interest rate or calculation, the parties stipulated that the rate of interest charged by Willow is "commercially reasonable." SKW Real EstateLimited Partnership v. Gallicchio, 49 Conn. App. 563, 579 (1998). This court is satisfied the failed index rule under Connecticut law is not applicable to this case. The defendants still claim that the plaintiff failed to sustain its burden of proof concerning the interest calculations. Exhibit 45 contains Statistical Release H.15 (519) for the month of April in the years 1993 through 1998. Exhibit 45, Statistical Release H.15 (519), for 1997 and 1998 has a notations on the reverse following the numbered footnotes; "Current and historical H.15 date are available on the Federal Reserve Board's web site (http://www.bog.frb.fed.us/). The defendant objected to the plaintiff's print out of information allegedly obtained from this very website. The court sustained the objection.
The court finds that Exhibit 45, Statistical Release H.15 (519), was obtained by Breibart directly from the Federal Reserve Bank. It is labeled "Federal Reserve Statistical Release." It is defined by the Federal Reserve Bulletin as a statistical release of "Selected Interest Rates" released weekly. Exhibit 45 contains selected interest rates for each month of April for the years of 1993 to 1998. The description of the Treasury Constant Maturity Series on the reverse side of Statistical Release H.15 (519) clearly states that it is not a list of interest rates but is based on "composites" read from a yield curve and are interpolated by the U.S. Treasury from the daily yield curve. This court concludes that the portion of Exhibit 45 used by CT Page 841 Breitbart in establishing the interest rate is an "index" and that Statistical Release H.15 (519), although not published in the Wall Street Journal, is commercially reasonable and generally available. Breitbart has had substantial experience with other indices: Prime Rate and LIBOR (London Inter-Bank Offered Rate). Both add a spread in order to set an actual interest rate. The defendant offered no legal authority that Exhibit 45 is not an "index". An index is "a ratio or other number derived from a series of observations and used as an indicator or measure." Webster's Seventh New Collegiate Dictionary, p. 427, definition 7.
The defendant argues that Statistical Release H.15 states "Selected Interest Rates." An examination of the numbers contained reveal that no one would select that rate to loan money. The numbers for April vary from an low of 3.24 to a high of 5.99. These are not a list of commercially available interest rates. The defendant offered no proof thereof, as it couldn't. They are indices to which a formula amount is added to produce an interest rate; in this case 3.75%. The court finds that the portion of Exhibit 45 used by Breitbart is that which is required by the formula contained in the Citytrust note. From the "Instruments" column, Breitbart selected the "Treasury constant maturities 1-year" line and chose the last column entitled "1993 Apr." The other 7 columns deal with a specific day in April. The note refers to the "last full calendar month," not the last day or any other day of the month. This last column is the correct column as determined by the language of the note. It is interesting to note that the last column in Exhibit 45 contains in the "Treasury constant maturities 1-year" line, generally a lower number than most other columns in that line for the years 1993-1998.
Of the 38 "Instruments" listed in the first column of Exhibit 45 for April 1998 only three refer to a "one year" the period set forth in the note. The note states "above the current (1) one year Weekly Average Treasury Index." The first one year reference is to "Treasury bills, Auction average, 1-year", the second to "Treasury bills, Secondary market, 1-year" and the third to "Treasury constant maturities, 1-year" All three are listed under U.S. government securities. The court finds that the last is more appropriate to use in mortgage rates. It is based on constant maturities and contains more variable maturities from 3 months to 30 years, whereas the Treasury bills references contain only three choices of maturity, 3-months, 6-months and 1-year. The index as set forth in the note is therefore found in Exhibit 45 CT Page 842 for 1993 as the "Treasury constant maturities, 1-year "column under" 1993 Apr." and each April thereafter. This index is 3.24 and is the base. To this, 3.75% is added (375 basis points) with the resulting interest rate for April 1993 being 6.99%. Footnote 3 as to the two other choices states, "Annualized using a 360-day year or bank interest. This alone eliminates these two choices from consideration since the note refers to "Weekly Averages." Footnote 4 as to the two other choices states "On a discount basis." This language does not appear in the note. This further confirms the court's conclusion that Breibart's index selection line and column is the one established by the Citytrust note.
The court therefore finds: (1) Exhibit 45, Statistical Release H.15 (519) is an "index". (2) It is the index set forth in the Citytrust note. (3) Using the formula in the Citytrust note, the proper column is the last column listed under "1993 Apr" in the line "Treasury constant maturities, 1-year" in Statistical Release H.15(519). (4) The interest rate as of April 1993 is 6.99% The interest rate is 12.15% for the 31 days through and including June 15, 1993 (Exhibit 15, 17 and 45). (5) The interest rate is adjusted each year in accordance with Exhibit 45. (6) The interest rate for April 1994 is 8.57%. April 1996, 10.02% April 1996, 9.29%, April 1997, 9.74%, April 1998, 9.13% and April 1999 8.44% (7) The starting point for interest under the note is June 15, 1993 (Exhibit 17). (8) This very document, Statistical Release H.15 (519), was received by the defendants without objection when interest rate changed (Exhibit 48, July 10, 1989 letter, and Exhibit 49 June 25, 1990 letter and Exhibit 50). Statistical Release H.15(519) was attached and referred to the index in the line "TREASURY CONSTANT MATURITIES", 1-year and the last column for "Apr." Grencom paid that interest rate after receiving and relying on those documents. (9) Exhibit 45 is the one and the some Statistical Release H.15 referred to in said $1,5000,000 Citytrust note. Federal Deposit Insurance Corporationv. Carabetta, 55 Conn. App. 384, 398-99 (1999), (10) Interest on the note is an arrears and as of June 15, 1993 the prior month's interest was due on the unpaid principal of $1,423,989.71 and (11) interest are based upon 360 day year for a partial year.General Statutes § 37-1(a).
The court finds that the balance due on the Citytrust mortgage as of June 15, 1993 is $1,423,989.71. The court has done its own independent calculations of interest using these above findings and interest rates and finds that the interest on the $1,423,989.71 principal balance due from June 15, 1993 to July CT Page 843 21, 1999 is $792,169.04. This uses the above stated interest rates. The court finds that late charges are due pursuant to the terms of the note in the amount $10,535.41. (Exhibit 32) FDIC v.Napert-Boyer Partnership, 40 Conn. App. 434, 443-444 (1996). These three total $2,226,694.16 (Exhibit 45.) In addition, the current per diem interest rate is calculated to be $333.85 commencing July 22, 1999 to the date of payment.
This court finds using that per diem of $333.85 that the total indebtedness; principal, interest, late charges and per diem interest to, January 14, 2000, is $2,285,785.61. The parties have agreed to bifurcate the issue of attorney fees and costs on both the plaintiffs' complaint and the defendants' counterclaim until a separate proceeding.
If the courts' findings as to the correct line and column is in error, the failed index rule would apply. The parties have stipulated that the interest charged is commercially reasonable. This court, as an alternative conclusion, finds that the specific interest rates set forth in this section of the decision for Apr. of each year is a reasonable rate of interest and satisfies the requirements of the imposition of the failed index rule. SKW RealEstate Limited Partnership v. Gallicchio, supra,49 Conn. App. 579.
 DISCUSSION OF LAW
This foreclosure action invokes the equitable jurisdiction of this court. Southbridge Associates LLC v. Garofalo,53 Conn. App. 11, 15 (1999); City Savings Bank v. Lawler, 163 Conn. 149, 155
(1972); Reynolds v. Ramos, 188 Conn. 316, 320 (1982). "Because a mortgage action is an equitable proceeding, the trial court may consider all relevant circumstances to ensure that complete justice is done." Id. 320. The issue raised by the defendants in their special defenses and counterclaims invoke the equitable powers of this court. These special defenses and counterclaims have successfully withstood a motion to strike filed earlier in this case. This court agrees with the February 28, 1996 Memorandum of Decision on these issues. Willow Funding Co. LP v.Grencom Ass., Superior Court, judicial district of Stamford/Norwalk, docket number CV 95-0146003 S (February 28, 1996, Stevens, J.) 1996 Ct. Sup. 1365-xxxx. "Since a mortgage foreclosure is an equitable proceeding, either a forfeiture or a windfall should be avoided if possible." Farmers MechanicsSavings Bank v. Sullivan, 216 Conn. 341, 354 (1990). CT Page 844
The defendants have claimed by way of special defense that the plaintiff is guilty of unclean hands and is therefore not entitled to the equitable relief of foreclosure "where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." Bauer v. Waste Management of Connecticut,Inc., 239 Conn. 515, 525 (1996). "The clean hands doctrine is applied not for the protection of the parties but for the protection of the court . . . It is applied not by way of punishment but on considerations that make for the advancement of right and justice." Pappas v. Pappas, 164 Conn. 242, 246 (1973). "Application of the doctrine of unclean hands rests in the sound discretion of the trial court." A B Auto Salvage, Inc. v.Zoning Board of Appeals, 189 Conn. 573, 578 (1983).
The defendant's further claims that the action of the plaintiff in taking on the CARC deal as its own deal violated the fiduciary duty that it owed to the plaintiff. The defendants made these allegations in its Second Affirmative Defense and in the First Revised Counterclaim. Although acknowledging that generally a lender does not owe a borrower a fiduciary duty, Grencom urges that under the circumstances of this case with the plaintiff not being a generally recognized banking institution and engaging in the acts that it did, that there was a fiduciary relationship between the parties. Southbridge Associates LLC v. Garofalo, supra, 53 Conn. App. 18-19. First National Bank in Lenox v.Brown, 181 N.W.2d 178, 182 (Iowa 1920). Stone v. Davis,419 N.E.2d 1094, 1097 (Ohio, 1981) Connecticut has adopted the view that a bank can be in a fiduciary capacity to a borrower if upon being presented with a transaction by a prospective borrower seeking a loan, the bank usurps the transaction as its own. The facts in this case are like a restructure agreement in which the bank reneged. On such facts an action will lie. Hartford NationalBank Trust Co. v. Bowers, 3 Conn. App. 656. 659-60 (1985)Citicorp Mortgage Inc. v. Miller, Superior Court J.D. at Fairfield, docket number CV 96-0326759 S (December 17, 1996, West, J.); 1996 Ct. Sup. 6649 Cooper v. Burby, Superior Court, J.D. of Hartford-New Britain at Hartford, docket number CV 92-387563 (April 29, 1992, Satter STR), 1992 Ct. Sup. 3916; GreatCountry Bank v. Kiely, Superior Court, Judicial District of Ansonia/Milford at Milford, Docket No. 047460 (December 19, 1995 Curran, J.) 1995 Ct. Sup. 12045.
In addition, Grencom argues, there was a fiduciary relationship CT Page 845 by reason of the fact of the parties relationship. ElectronicAssociates, Inc. v. Automatic Equipment Development Corporation,185 Conn. 31, 35 (1981). The general rule as to the obligations owned once there is fiduciary duty or well stated in Connecticut "A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to respect the interests of the other." Dunham v. Dunham,204 Conn. 303, 322, (1987). "This court has, however, specifically refused to define `a fiduciary relationship in precise detail and in such a manner as to exclude new situations' choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other'." Alaimo v Royer,188 Conn. 36, 41 (1982).
A fiduciary has the duty to deal honorably and fairly and account to his fellow member. Dunhan v. Dunham, supra,204 Conn. 322. "A fiduciary is a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires. A person having duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking" Albom v. KatzCorporation, Conn 39 Conn. Sup. 533, 535-36 (1983).
"Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary." Dunham vDunham, supra, 204 Conn. 322. "The plaintiff, as a fiduciary, had the duty to deal fairly with the defendant, not simply to act reasonably based upon the relevant information." KonoverDevelopment Corporation v. Zeller, 228 Conn. 206, 221 (1994). The defendant bears the initial burden of proof of establishing that a fiduciary relationship exists by a preponderance of the evidence and the burden then shifts to the plaintiff, as the fiduciary, to establish fair dealing by "clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." Konover Development Corporation v.Zeller, supra, 228 Conn. 230; Dunham v Dunham, supra,204 Conn. 322-23. The Supreme Court adopted the following framework to be utilized in determining whether the fiduciary has sustained its burden of proving fair dealing. 1) That the fiduciary made a free and frank disclosure of all relevant information it had; 2) that the consideration was adequate; 3) that the principal had competent and independent advice before completing the CT Page 846 transaction; 4) and the relative sophistication and bargaining power among the parties. It appears that all four of these factors are needed for the fiduciary to sustain its burden of proving fair dealing. Konover Development Corporation v. Zeller, supra, 228 Conn. 228.
The rule of shifting of burden of proof to the fiduciary once a fiduciary duty is shown is not absolute. "In the absence of a claim of fraud, self-dealing or conflict of interest, the trial court was not required to charge the jury that the defendant had a duty to prove his fair dealing by clear and convincing evidence." Murphy v. Wakelee, 247 Conn. 396, 400 (1998). In Murphy it was held that the burden of proof does shift when fraud is alleged. "But Connecticut law routinely shifts the burden of proof, irrespective of circumstances, where a fiduciary appears to have obtained a benefit at the expense of a person to whom be owes a fiduciary duty. See e.g. Konover Development Corp. v.Zeller, 228 Conn. 206, 635 A.2d 798 (1994)" Martinelli v.Bridgeport Roman Catholic Diocesan Corp. , ___ F.3d ___, (2d. Cir. 1999), released November 12, 1999. This court finds that the defendant has alleged fraud, conflict of interest and self-dealing in its counterclaims. Thus upon a finding of fiduciary duty the burden would shift to the plaintiff to by clear, convincing and unequivocal evidence.
The defendant claims usurpation of opportunity. Robert S. WeissAssociates, Inc. v. Wiederlight, 208 Conn. 525, 535-36 (1998); "Not every act that disturbs a contract or business expectancy is actionable." Jones v. O'Connell, 189 Conn. 648, 660-1 (1983). The defendant must prove that the plaintiff's action was tortious such as fraud, misrepresentation, intimidation or molestation or that the plaintiff acted maliciously. It requires the pleading of an improper motive or means. The interference resulting in injury is wrongful by some measure beyond the fact of the interference itself. Robert S. Weiss Associates v. Wiederlight, supra,208 Conn. 536. Katz Corporation v. T.H. Canty, 168 Conn. 201, 208-09
(1975).
Every contract imposes upon each party an implied duty of good faith and fair dealing in its performance or enforcement. HomeInsurance Co. v. Aetna Lite Casualty Co., 235 Conn. 185, 200
(1995); Warner v. Konover, 210 Conn. 150, 155 (1989). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . ." Id. 155. The covenant of CT Page 847 good faith and fair dealing is a rule of construction on contracts "designed to fulfill the reasonable expectations of the parties as they presumably intended." Magnon v. AnacondaIndustries Inc., 193 Conn. 558, 567 (1984). "Good faith negotiations may be described as including honest and sincere efforts to engage in discussions and pursue reasonable possibilities to resolve the matter in dispute, with the parties taking into consideration their own respective needs, requirements and legal obligations. By definition, good faith and fair dealing, exclude fraud and deceit, and depending on the circumstances, may exclude the recapturing of opportunities that have been legally foregone." Elliott v. Staran, 46 Conn. Sup. 38-48 (1999), affirmed 54 Conn. App. 632-633 (1999). "Action in good faith involves an honest effort to explore reasonable possibilities to settle a dispute and does not involve the party's efforts to find any conceivable basis to be obstreperous." Id. 48.
A joint venture is an association of persons by way of a express or implied contract to engage in and carry out a single business venture for joint profit in which the parties combine their money, property skills and knowledge without the formal creation of a partnership or a corporation. There shall be an agreement that there is a community of interest among the parties. Electronic Associates Inc. v. Automatic EquipmentDevelopment Corp. , supra, 185 Conn. 35. "In a joint adventure it is not necessary that there be an express agreement, for the conduct of the parties and other circumstances will often justify the inference that such an agreement existed; and the contract is not avoided for indefiniteness because the minor details are not fully established." Dolan v. Dolan, 107 Conn. 342, 349 (1928).
 CONCLUSION
After hearing all the evidence this court concludes that the plaintiff had a fiduciary duty to all the defendants. Twachtmanv. Hastings, 52 Conn. App. 661, 667 (1999). There was a relationship characterized by a unique degree of trust and confidence between the parties. The plaintiff benefitted [benefited] from the transaction. Regardless of the general business sophistication of the defendants they were in an unequal bargaining position dealing with Willow's extensive failed bank and auction experience. The burden of proving fair dealing now shifts to the plaintiff, to prove fair dealing by clear and convincing evidence. In this regard the court has considered the following CT Page 848 findings: (1) Grencom revealed personal confidential information concerning the leases and the status of the building to Willow, facts that would not be contained in CARC's records or public records, facts not available to any other person bidding on the loan package. (2) Grencom revealed that information to Willow so they would enter into the $865,000 loan agreement. (3) The $865,000 loan agreement contained a benefit to both parties. (4) Willow was benefitted [benefited] by the reduction of the principal and interest due of over $1,400,000 to $500,000, interest on the $865,000 loan and by receiving a "vig" of $165,000. (5) Grencom was benefitted [benefited] by reducing substantially their second mortgage obligation and substituting a new second mortgage in pay status, thereby securing their continued ownership, occupancy and use of the premises. (6) Willow was a position of superiority over Grencom in that there was an October 31, 1994 deadline on the closing for the discounted payment. They knew Grencom's inside financial information in detail. (7) Willow knew the methods of acquiring second mortgages from failed banks because it was the ordinary course of business for Willow to do so. Grencom, Collins and Emil did not. (8) Willow was in a position of superiority because they failed to notify Grencom that in fact they were engaged in the business acquiring second mortgages, and knew of the protocol, terms, conditions and methodology thereof. Willow never disclosed this information to Grencom at any time. (9) Grencom was acting in good faith and fair dealing in negotiating this agreement with Willow. (10) Grencom had placed trust and confidence in Willow by entering into the $865,000 loan agreement upon terms and conditions agreeable to Willow and paying $5,000 attorney fees to support that agreement. (11) This was not an ordinary borrower lender relationship. There was no evidence Willow was a bank. Willow was getting a $165,000 vig. Willow received a large equity interest in the transaction. Willow took on the reduction benefit of $500,000 for its own account, again not the attribute of an ordinary borrower-lender relationship. (12) Willow was also in a superior position since the defendants were ineligible to bid at the public auction and Willow was eligible and experienced in doing so.
This court concludes that Willow as a fiduciary has failed to sustain its burden of proof by clear and convincing evidence that it engaged in fair dealing. Konover Development, Corporation, v.Zeller, supra, 228 Conn. 228. None of the four elements cited in Konover have been established by the plaintiff. The plaintiff breached its fiduciary duty to Grencom and acted inequitably. The court reaches these conclusions based upon the following CT Page 849 findings:
Willow failed to disclose that it was the ordinary course of its business to acquire second mortgages from the FDIC and that is was experienced in acquiring mortgages by bid. Willow obtained private financial information from Grencom not available to CARC or the bidding public and used it to its own advantage. Willow either did not prepare the necessary closing documents, or delayed the preparation of the closing documents. Willow offered no explanation for this delay. Willow submitted one closing document, a rider to a guarantee to the defendant, which contained terms entirely different than that set forth in the party's understanding and agreement. The fair inference this court draws is that the plaintiff did so within ten days of the October 31, 1994 CARC deadline, so that Grencom could not obtain the benefit of his $500,000 second mortgage reduction with any other lender. Willow refused to modify the "spring back guarantee" consistent with the party's agreement. This enabled Willow to attend the public auction and purchase the mortgage for its own benefit. Willow's obligation under its duty of good faith and fair dealing in fulfillment of its fiduciary duty to the defendants and obligation to do equity when the deal ended because the terms and conditions of the rider could not be agreed upon, would be for Willow not to bid any CARC pool of loans in which the Grencom mortgage was contained. In the event that they did so bid and were successful in the bidding, it was Willow's obligation to fulfill their duty to enter into good faith negotiations to put into full force and effect the $865,000 second mortgage agreement with Grencom. Willow failed to do either.
In further support of the violation of the plaintiff's fiduciary duty the court finds the following: Willow attempted to sabotage the business deal by engrafting a form of a guarantee inconsistent with its prior representations and agreement, approaching CARC without telling Grencom, its co-venturer, that it was doing so for its own account, approaching CARC without telling its co-venturer, Grencom that it would not adhere to its word in accordance previously negotiated business agreement, and after obtaining the acquisition of the CARC mortgage, attempting to take advantage of its co-venturer by demanding that Grencom pay to Willow the almost $1,000,000 discount which Grencom first negotiated on its behalf and presented to Willow.
This court concludes that Emil's comments to Breibart at the CT Page 850 December 1994 meeting in which he indicated that he considered Willow's actions in acquiring the mortgage under the circumstances a breach of fiduciary duty, is a correct statement of the law applied to the facts found. Emil paraphrased Justice Benjamin Cardozo's opinion in a 1928 New York decision. This 1928 case is the law in the State of Connecticut.
"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty . . ." Meinhard v. Salmon, 249 N.Y. 458,464, 164 N.E. 545 (1928). Konover Development Corporation v.Zeller, supra, 228 Conn. 218, fn. 9.
The court has already found certain facts and drawn conclusions based on the law of fiduciary duty. These same facts also support this court's independent determination that the plaintiff's came into court with unclean hands. Even if no fiduciary relationship existed between the parties and no breach of any fiduciary duty occurred, the above facts found are sufficient to support this court's conclusion that the defendant's are entitled to the relief granted by this court against the plaintiff. "Remedy will not be afforded where it would be practically unjust to give it `either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where by his conduct and neglect he has . . . put the other party in a situation in which it would not be reasonable to place him if the remedy where afterward to be asserted." Bassett v. CityBank Trust Co., 116 Conn. 617, 630 (1933).
The defendant also prevails independently of the consideration of unclean hands and breach of fiduciary duty. The court has found that the parties reached an agreement on October 4, 1994 and the plaintiffs unilaterally delayed in the performance of that agreement. On the last weekend before the expiration of the deadline the plaintiff presented to the defendants a rider to the "spring back guarantee" which the plaintiff knew was at variance with the party's agreement and unacceptable to the defendants. The facts found in this court's decision amply support the conclusion that the plaintiff's actions violated its implied duty CT Page 851 of good faith and fair dealing. Warner v. Konover, supra,210 Conn. 155. Even after the plaintiff's violations of its duty of good faith and fair dealing, it continued on the same vein by failing to resolve the issue hiding behind a supposed "attorney's direction," the very attorneys who had delayed the preparation of the time-driven closing documents. Elliott v. Staran, supra,46 Conn. Sup. 48. The defendants are entitled to the relief grated by this court against the plaintiffs on this ground alone.
So too based on the facts found the defendants are entitled to the relief granted by this court against the plaintiff on usurpation of opportunity. Robert S. Weiss and Associates, Inc.v. Wiederlight, supra, 208 Conn. 536. This conclusion can be sustained independently of the consideration of unclean hands, breach of fiduciary duty and breach of duty of good faith and fair dealing.
The defendants are not counterclaiming in specific performance. They are not seeking to enforce all the terms and conditions of the October 3, 1994 agreement. The plaintiff has furnished no authority that the statute of frauds, General Statutes §52-550, prevents an oral agreement otherwise unenforceable due to the statute of frauds, from being considered by the court in exercising its equitable powers. General Statutes § 52-550
states: "No civil action may be maintained . . ." The defendants are not maintaining a civil action to enforce an agreement. The statute of frauds on its face is inapplicable. Elliott v. Staran, supra, 46 Conn. Sup. 38: Southbridge Associates LLP v. Garafalo, supra, 53 Conn. App. 15.
Based on the facts found the defendants are entitled to the relief granted by this court against the plaintiffs on the grounds of breach of an obligation arising out of a joint venture. Both parties obtained jointly the benefit from the $500,000 CARC reduction. Both benefitted [benefited] from the $865,000 second mortgage agreement, each to profit in their own way as already found by this court. This court finds that the parties have combined their property, money, skills and knowledge to seek a profit jointly in a single business enterprise without any actual partnership or corporate status. Lesser v. Smith,115 Conn. 86, 89 (1932).
The fact that Willow purchased the note for its own account without informing Grencom of that fact and then did not fairly negotiate with Grencom based on the $865,000 second mortgage CT Page 852 agreement after purchasing the note for less than the $500,000 CARC discount, is evidence enough justifying the equitable remedy the court has imposed in this decision. This is so regardless of which legal theory is cited.
 REMEDIES
The court concludes that the plaintiff has proven the indebtedness, default and the defendants have proven its special defenses and counterclaims. The court now turns to its equitable obligations in this foreclosure action. The defendant's counterclaims claim a number of remedies.
(1) Defendant requests the court to withhold foreclosure "We emphasize that foreclosure is an equitable action . . . and that a trial court has discretion, after a review of the equities, to withhold foreclosure." Century Mortgage Co. v. George,35 Conn. App. 326, 332 (1994); Connecticut Bank Trust Co. v. Winters,26 Conn. App. 317, 321 (1991).
(2) The defendants request the court to impose a constructive trust on the mortgage. If one acquires property by means of a fraudulent misrepresentation of a material fact, equity will assist the defrauded person by imposing a constructive trust on the property. Millard v. Green, 94 Conn. 597, 601-02 (1920).Spatola v. Spatola, 4 Conn. App. 79, 81 (1985).
(3) The defendants seek in the alternative an accounting to Grencom by Willow and requests the court to apply partnership law to joint ventures when deemed appropriate. Roberts v. Weiner,137 Conn. 668, 671 (1951). Weidlich v. Weidlich, 147 Conn. 160,163-64 (1960).
(4) In the alternative the defendant's request the court to reduce the indebtedness based on equitable considerations. "We affirm that a trial court in foreclosure proceedings has discretion, on equitable considerations and principles, to withhold foreclosures or to reduce the amount of the stated indebtedness." Hamm v. Taylor, 180 Conn. 491, 497 (1980);Connecticut Bank Trust Co. v. Winters, supra,26 Conn. App. 322; Reynolds v. Ramos, supra, 188 Conn. 320.
In choosing one of these remedies, the court must return to the general equitable considerations of unclean hands in regards to dealing with Willow, who has acted inequitably. "Whenever a party CT Page 853 who, as actor, seeks to set the judicial machinery in motion to obtain some relief, has himself violated conscience or good faith in his prior conduct with the matter of the controversy, then the door of the court will be shut against him; the court will refuse to interfere in his behalf, to acknowledge his right, or award him any remedy." Gest v. Gest, 117 Conn. 289, 298 (1933). "An action of foreclosure is peculiarly equitable and the court may entertain all questions which are necessary to be determined in order that complete justice may be done between the parties . . . Equity will not afford its aid to one who by his conduct or neglect has put the other party in a situation in which it would be inequitable to place him." Glotzer v. Keyes, 125 Conn. 227,231-32 (1939). "The complainant ought not to be the transgressor himself, and then complain that by chance he has injured on account of his own wrongful misconduct . . . the equity court will not lend him its jurisdiction to right a wrong of which he himself is the author . . . Equity imperatively demands of suitors in courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. . . . Under this maxim, any wilful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair minded men, will be sufficient to make the hands of the applicant unclean." Boretz v. Segar, 124 Conn, 320, 323-24
(1938).
Applying those principles this court believes that the defendants are entitled to the benefit of the bargain that they made with CARC and Willow. The defendant have advanced this proposition in its Defendants' Post-Trial Memorandum dated April 16, 1999 at page 27. "Equity requires at a minimum, that Willow Funding be held accountable for its negotiated bargain with Grencom and that Grencom be held liable only for that to which it had previously agreed." In accordance with that bargain, this court will reduce the original indebtedness of $1,423,989.71 as of November 1, 1994, the day after the CARC deadline expired on its $500,000 offer, to $500,000. On and after November 1, 1994 interest at the rate set forth in Statistical Release H.15 (519), Exhibit 45, as found by this court will be applied.
The court will delete the late charges from the damages since the contract between Grencom and CARC excluded late charges and accrued interest and reduced the principal to the $500,000. There was no proof of the method of calculating the late charges nor was the date of any demand or acceleration by Citytrust shown.Berkeley Federal Bank Trust, FSB v. Ogalin, 48 Conn. App. 205, CT Page 854 213 (1998).
The $200,000 cash that was to be advanced by Willow to as part of the $865,000 loan Grencom was not advanced. This $200,000 is not to be included in the indebtedness since it was not paid by the plaintiff to the defendant and the defendant did not receive its benefit.
The concept that the defendants are entitled to the benefit of the bargain they made with CARC and Willow permits the court to award the $165,000 vig as part of plaintiff's claim. The concept that the plaintiff should not profit by their wrong doing prevents the court from awarding the $165,000 vig as part of plaintiff's claim. This court must balance the equities in considering this $165,000. The court concludes that the $165,000 was based on a total loan of $500,000 for the CARC payoff and $200,000 of fresh money. This total loan was $700,000 and the $165,000 vig represented 23.57142% of that total. In round numbers the $165,000 is 25% of the $500,000 and 20% of the $200,000. The court balances the equities in favor of the plaintiff and holds that the defendant's expectancy of the bargain included payment to the plaintiff of a vig. The court heard no evidence on how the $165,000 vig was computed. The court therefore will choose the simpler percentage and award the plaintiff 25% of the $500,000 CARC payoff as a vig and no percentage of the $200,000 since that sum was not advanced. The court finds the vig to be $125,000 and thus the total principal debt is $625,000. "Equitable powers must be exercised equitably."Connecticut Bank and Trust Co. v. Winters, supra,26 Conn. App. 322.
The parties have stipulated, in the event of a judgment for the plaintiff, a foreclosure, by sale will be ordered. A motion to that effect dated November 15, 1996, was filed, motion #171, and Exhibit BB. The parties have further stipulated that the issue of attorneys fees as to the plaintiff's complaint and/or the defendants' counterclaims will be considered at a separate hearing. The court hereby orders an appraisal fee to the plaintiff in the amount of $4,700. (Exhibit 37)
The total indebtedness without attorney fees, court costs and appraisal fees is $625,000. The interest from November 1, 1994 to January 14, 2000 based on the above found interest rates is:
11/1/94 — 10/31/95 at 8.57% on $625.000 equals $53,562.50 CT Page 855 11/1/95 — 10/31/96 at 10.02% on $625.000 equals $62,625.00 11/1/96 — 10/31/97 at 9.29% on $625,000 equals $58,062.50 11/1/97 — 10/31/98 at 9.74% on $625,000 equals $60,875.00 11/1/98 — 10/31/99 at 9.13% on $625,000 equals $57,062.50 11/1/99 — 01/14/00 at 8.44% on $625,000 equals $10,989.78
$303,177.25
The per diem interest on and after January 15, 2000 is calculated of the rate of 8.44% until paid, despite General Statutes §37-1 and 37-3a. The per diem is $146.53. To this is added the $4,700 appraisal fees. No costs are ordered to either party since both parties partially prevailed. Costs taxed by the Appellate Court on October 19, 1998 will remain as ordered. The total debt including principal, interest through and including January 14, 2000 and the appraisal fee is $932,877.25.
The defendant seeks punitive damages and attorney fees on its two count counterclaim of breach of fiduciary duty and breach of implied covenants of good faith and fair dealing. Neither cause of action containing any authority for the court to award attorney fees. Neither count alleges wilfulness or malicious sufficient to warrant the imposition of common law punitive damages Triangle Sheet Metal Works Inc. v. Silver, 154 Conn. 116,128 (1966); Gargano v. Heyman, 203 Conn. 616, 622 (1987); Collensv. New Canaan Water Co., 155 Conn. 477, 489 (1967). In any event this court has already exercised its equitable powers and the defendants have benefitted [benefited] by well over one million ($1,000,000) dollars. No further relief to the defendant in the form of punitive damages or attorneys fees are appropriate under these circumstances. The plaintiff's actions as found have been costly to the plaintiff's fisc.
Just after the previous trial, the defendants sought to add a CUTPA counterclaim. This request was never acted on by the court. After the Supreme Court decision the defendant did not prosecute its motion to amend the counterclaim by adding a CUTPA count. Only after the third day of trial before this court after the plaintiffs case in chief concluded did the defendants file a written motion to amend its counterclaim by adding a CUTPA claim. This court denied that motion on July, 1, 1999, the day before the commenced evidence on the fourth day of trial. The parties did not brief CUTPA. The only counterclaim before the court was the revised two count counterclaim dated December 18, 1996, which did not contain a CUTPA claim. CT Page 856
The court believes that an award of attorneys fees to the plaintiff is appropriate in this foreclosure trial. An evidentiary hearing will be held for the purpose of determining the reasonable amount of the plaintiff's attorneys fees taking into account the following considerations: Contemporaneous time records under Tedesco v. City of Stamford, 24 Conn. App. 377, 385
(1991), Connecticut General Statutes § 49-7, Rules of Professional Conduct Rule 1.5., Hernandez v. Monterey VillageAssociates Limited Partnership, 24 Conn. App. 514, 517 n. 3 (1991), Johnson v. Georgia Highway Express Inc., 488 F.2d 714,717-19 (5th Circuit 1974), Steiger v. J.S. Builders Inc.,39 Conn. App. 32, 35-36 (1995) ("There must be some reasonable relationship to the end result and the attorney's fees") and the limitation on attorney fees in foreclosure actions as set forth in Connecticut National Bank v. Brown, Superior Court judicial district of Stamford/Norwalk at Stamford, Docket Number CV90 0107084 S, August 14, 1992 (Mottolese, J.), 1992 Ct. Sup. 7675.
In accordance with the foregoing a judgment of foreclosure may enter and the parties are ordered to appear before the undersigned to complete the bifurcated portions of the proceedings as to the form of judgment and plaintiff's attorneys fees.
BY THE COURT.
TIERNEY, J