JAMES J. FERRIS *v.* POLYCAST TECHNOLOGY
CORPORATION

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued  January  18—decision  released  April  1,  1980

*Emanuel Margolis*, with whom were *Steven Berglass* and *Guy Farina*, for the appellant (defendant).

*Richard Greenwald*, with whom was *James P. Driscoll*, for the appellee (plaintiff).

PETERS, J.   This case concerns the relationship between a small corporation and one of its directors and officers.   James J. Ferris, the plaintiff, brought an action to recover moneys lent as advances to and for the defendant, Polycast Technology Corporation.   The defendant filed an answer denying liability and a counterclaim seeking damages for misuse of insider information, breach of fiduciary duty and misappropriation of corporate opportunity.   After a trial to the court, *Saden, J.*, the issues on both the complaint and the counterclaim were found for the plaintiff, and judgment was rendered accordingly.   The defendant has appealed.

The issues on this appeal are threefold: (1) did the plaintiff establish the amount of the defendant's outstanding indebtedness to the plaintiff, (2) did the defendant establish any of the various counts

of its counterclaim, and (3) did the trial court conduct the trial in a manner prejudicial to the defendant's right to a fair trial?

The underlying facts of the relationship between the plaintiff Ferris and the defendant Polycast Technology Corporation (hereinafter Polycast) are not in serious dispute. Polycast is a manufacturing corporation which became involved in bankruptcy proceedings in the late 1960s. Ferris, an engineer, first became affiliated with Polycast while it was in bankruptcy, as a representative of and then as an employee of the trustee in bankruptcy. In 1968, the corporation was successfully reorganized and Ferris became an officer and a shareholder, purchasing 76,500 shares at a cash price of thirty cents per share and contributing as well machinery and equipment and other rights. Later that year, he purchased 5000 additional shares at one dollar per share, pursuant to a stock option. Shortly thereafter he transferred 35,000 shares to his wife, leaving him with ownership of the remaining 46,500 shares.[1] Ferris became a director and secretary of the corporation in 1969. In 1971 and 1972, Ferris sold his remaining shares for $525,000. He left the corporation in 1972.

The indebtedness that gave rise to the case in chief arose in 1971, when Ferris lent money to Polycast and, at Polycast's request, paid moneys to creditors of Polycast. Sums totaling $112,889 were advanced to or on behalf of Polycast, and a substantial part of the outstanding indebtedness and interest was repaid by Polycast.

---

[1] It was stipulated at trial that Polycast is a publicly held corporation that had, at the relevant time, approximately one million shares issued and outstanding.

## I

The first issue on this appeal challenges the sufficiency of the evidence to support the trial court's finding that the outstanding balance of the loans owed to Ferris was $42,150. This finding, and the correlative finding that the defendant had agreed to repay these loans with interest at 9 percent per annum, led the court to enter judgment in the principal amount of $42,150 and $24,782.64 for interest to December 31, 1977, plus interest at 9 percent on $42,150 from January 1, 1974, to the date of judgment. Only the amount of the outstanding balance on the principal has been contested.

The defendant's attack on the court's finding is not sustainable. The plaintiff established the amount of his claim by four different sources. The plaintiff himself testified about the amount of the loans that had not been repaid. Kenneth J. Doyle, a certified public accountant in the firm of Price Waterhouse & Company, which audited the defendant's books for 1970 and 1971, confirmed the same amount. The plaintiff's attorney at the time of the transaction testified to the receipt of a letter acknowledging the same amount of the indebtedness, a letter that purported to be signed by Henry P. Von Keyserling, then Polycast vice-president of finance, on what purported to be Polycast stationery. The defendant's current treasurer, Richard Schneider, produced Polycast ledger sheets which were admitted into evidence and which substantiated the plaintiff's claim.

The defendant challenges the admissibility of this documentary evidence, the Von Keyserling letter

and the Polycast ledger sheets. Their receipt into evidence was clearly within the discretion of the trial court. *American Oil Co.* v. *Valenti,* 179 Conn. 349, 361, 426 A.2d 305 (1979); *Doran* v. *Wolk,* 170 Conn. 226, 232, 365 A.2d 1190 (1976). The letter from Von Keyserling was a reply to an earlier letter from the plaintiff's attorney asking Polycast's controller for an accounting. *Garland* v. *Gaines,* 73 Conn. 662, 665, 49 A. 19 (1901); *Deep River National Bank's Appeal,* 73 Conn. 341, 347, 47 A. 675 (1900). With regard to the admissibility of a reply letter, it is immaterial that the letter of inquiry was addressed to one financial officer and that the reply came from another, when the answering letter on its face indicates its relationship to the earlier inquiry. The defendant's corporate ledger sheets acknowledging indebtedness are admissible as admissions by a party opponent whether or not they qualify under the business entry exception to the hearsay rule.[2] In any case, all of the challenged documentary evidence was cumulative to other testimonial evidence directly offered by the plaintiff to substantiate the sums due and owing to him. There is therefore no error in the judgment on the plaintiff's claim.

## II

The second issue on this appeal concerns the trial court's determination that the defendant failed to prove by competent evidence the various allegations contained in its three-part counterclaim. Having found the evidence insufficient, the court made no findings of fact relating thereto and concluded only

---

[2] Although it is possible that these ledgers might have qualified as business entries, they were neither offered nor admitted as such.

that the plaintiff did not commit any breach of duty or engage in any conduct detrimental to the defendant.

The counterclaim's allegations of breach of fiduciary duty were supported by evidence which could have established the following facts. The plaintiff, while an officer and a director of the defendant corporation, sold his stock holdings in the corporation for a nominal cash gain of $525,000. At the time of the sale, to which the corporation formally consented, the plaintiff had actual knowledge that the corporation was in financial difficulties. The moneys received from the sale of the stock were in large part used to provide short term working capital for, to make loans to, and to pay creditors of, the defendant corporation. A subsequent audit of the corporate financial records of this time period by Price Waterhouse & Company concluded that the records were inadequately maintained. The plaintiff, as the defendant's director, secretary, and vice-president of engineering, might have insisted upon access to the financial records, but in fact relied upon others to supervise financial planning and record-keeping.

The first count in the defendant's counterclaim relates to insider trading. We have recognized, in *Katz Corporation* v. *T.H. Canty & Co.*, 168 Conn. 201, 210-11, 362 A.2d 975 (1975), that "inside trading by a corporate fiduciary may be a violation of the common-law duty which he owes to his corporation." That principle is not at issue. The question is only whether the defendant proved that the plaintiff improperly profited from material, undisclosed information obtained in his position as officer or director. The plaintiff's alleged wrongful

gain relates to his receipt of a nominal cash gain of $525,000 upon his sale of the corporate stock; the alleged inside information relates to his knowledge of the defendant's precarious financial position and his notice of inadequate financial records. These allegations are unsustainable in light of the evidence presented at trial. The proceeds received upon sale of the defendant's stock, while demonstrating a cash gain, do not reveal whether the plaintiff in fact made a profit or suffered a loss. As the defendant's own counterclaim asserts and the transcript substantiates, the plaintiff was issued stock in return for a contribution which consisted not only of cash but also of machinery, equipment and other rights. In the absence of evidence about the value of the plaintiff's non-cash contributions, it is not possible to charge the plaintiff with illicit gains. Further, despite the counterclaim's allegation that the plaintiff's sale depressed the market in the defendant corporation's stock, no evidence was offered of the market price of other contemporaneous stock transactions or of the fair value of the stock. Finally, it is difficult to characterize as material the failure to disclose the uncertain financial posture of a corporation only recently emerged from corporate reorganization in bankruptcy. Certainly this information was not unknown to the other corporate directors who asked the plaintiff to provide working capital. Nor was the plaintiff's intent to sell his stock unknown to them, for the plaintiff needed and received the corporation's consent for the sale. Whatever the common law of insider trading may encompass; Henn, Law of Corporations § 239 (1970); Lattin, Law of Corporations § 81 (1971); it does not reach this case.

The second count of the defendant's counterclaim maintains that the plaintiff is liable for failure to exercise the fiduciary care required of corporate officers and directors. Again, the principle of fiduciary obligation is not at stake. See Cross, Corporation Law in Connecticut § 6.8 (1972). The defendant argues that the plaintiff, although a vice-president of engineering, was, as director and secretary of a small corporation having only three directors, personally responsible for the sorry state of the corporate bookkeeping that was reported in a subsequent audit by Price Waterhouse & Company. The issue here is the extent to which fiduciary responsibility is inherently inconsistent with delegation, with division of labor among the corporate directors. "A director . . . must inform himself sufficiently about the business [of the corporation that he directs] so that he may act with intelligence in supervising the activities of the officers who carry on the actual day-to-day transactions. He is entitled to rely upon their expert advice where he has no notice of irregularities or knowledge of facts which raise suspicions of irregular or negligent conduct." Lattin, Law of Corporations 240–41 (1971).[3] The plaintiff, as director, presumably participated in the decision to enlist the services of an independent auditor to verify the corporate records and to suggest improvements where needed. There was no evidence that the plaintiff ignored the resultant recommendations contained in the Price Waterhouse audit, or that the corporation in fact was injured by the alleged impact of the audit on outside financing. This evidence does not reveal dereliction in the plaintiff's

[3] Cf. General Statutes § 33-313 (d), enacted subsequent to the proceedings herein.

fiduciary responsibility. There would be few candidates for positions as corporate officer or director if the requirement of prudential oversight of corporate business came to demand omnipresence or omniscience. Cf. Bishop, "Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers," 77 Yale L.J. 1078, 1095–1101 (1968). The trial court could reasonably conclude that, on these facts, no breach of fiduciary duty had been shown.

The third count of the defendant's counterclaim charges the plaintiff with impropriety in his transactions with the defendant corporation. This count focuses on the loans between the plaintiff and the defendant and alleges that they constitute a misuse of corporate opportunity. Once again, the underlying legal principles are not in doubt. A director has the burden of showing that any personal dealing between him and his corporation is consistent with good faith, fairness, and is for adequate consideration. General Statutes § 33-323 (a) ;[4] *Katz Corporation* v. *T.H. Canty & Co.*, 168 Conn. 201, 207, 362 A.2d 975 (1975); *Osborne* v. *Locke Steel Chain Co.*,

[4] Section 33-323 of the General Statutes entitled "Corporate transactions with directors and others" provides, in relevant part: "(a) A contract or transaction between a corporation and a director thereof . . . shall not be voidable, and such director shall not incur any liability, merely because such director is a party thereto or because of such family relationship or interest, if: (1) Such family relationship or such interest, if it is a substantial interest, is fully disclosed, and the contract or transaction is not unfair as to the corporation and is authorized by (i) directors or other persons who have no substantial interest in such contract or transaction in such a manner as to be effective without the vote, assent or presence of the director concerned or (ii) the written consent of all of the directors who have no substantial interest in such contract or transaction, whether or not such directors constitute a quorum of the board of directors . . . or (4) the contract or transaction is fair as to the corporation."

153 Conn. 527, 534, 218 A.2d 526 (1966); *Klopot* v. *Northrup*, 131 Conn. 14, 20-21, 37 A.2d 700 (1944); *Massoth* v. *Central Bus Corporation*, 104 Conn. 683, 689, 134 A. 236 (1926); *Sisk* v. *Jordan Co.*, 94 Conn. 384, 389-90, 109 A. 181 (1920); *Mallory* v. *Mallory Wheeler Co.*, 61 Conn. 131, 139, 23 A. 708 (1891). See Cross, Corporation Law in Connecticut § 6.8 (1972); Lattin, Law of Corporations § 80 (1971). A director's usurpation of an opportunity that belongs to his corporation is one example of unfairness and lack of good faith. The specific allegations of the counterclaim with regard to this claim do not argue that the interest rate for the loans, set at 9 percent, was uncompetitive or otherwise unfair. Rather the charge is that the plaintiff unfairly converted his equity position as a stockholder into the position of a creditor, to the corporation's detriment. Like the trial court, we find this charge difficult to follow. The plaintiff's transactions provided assets for the corporation, thus enabling it to pursue whatever corporate opportunities might have appeared to be promising. The plaintiff's "conversion" was not at the corporation's expense: the stock sale, on the market, did not deplete corporate assets and the loans, made at the request of the other directors, and totally unsecured, could not have been a serious impediment to further equity financing. In any case, there was no evidence that alternate financing of any kind was ever attempted at the relevant period in time. The plaintiff's own testimony that he was not clear why he was being asked to provide working capital is no evidence that the transactions were unfair to the corporation. The plaintiff testified, without contradiction, that the relationship between the stock sale and the loans was dictated by the fact that he had no other source

of funds to assist the corporation to meet the demands of trade creditors. This explanation, together with the absence of evidence of harm to the corporation, satisfies the plaintiff's burden of proof that his transactions were "prima facie fair" within the requirements of General Statutes § 33-323 (d) (3).[5]

## III

The defendant's final argument on this appeal is that it is entitled to a new trial because the trial court's conduct of the trial violated the basic requirements of due process. The defendant claims that its failure to make the proper evidentiary showing to support its defense and especially its counterclaim was attributable to unjustifiable interference by the trial court. This is a serious charge. We have carefully reviewed not only the specific evidentiary rulings reprinted in the record and in the briefs but also the transcript as a whole. We find the charge groundless. The trial court's interventions, designed to foster orderly presentation of the case and to avoid repetitious argument, were entirely within the scope of its discretion "over matters occurring in the conduct of the trial." *Wooster* v. *Wm. C. A. Fischer Plumbing & Heating Co.,* 153 Conn. 700, 702, 220 A.2d 449 (1966); *Doran* v. *Wolk,* 170 Conn. 226, 232, 365 A.2d 1190 (1976); *Robinson* v. *Faulkner,* 163 Conn. 365, 371, 306 A.2d 857 (1972). The trial court's rulings dealt even-

---

[5] Section 33-323 (d) (3) of the General Statutes provides: "(d) For the purposes of this section . . . (3) any contract or transaction between a corporation and a person, corporation, firm or other organization made in the ordinary course of business at standard prices or on terms not less favorable to the corporation than those offered by the person, corporation, firm or other organization to others, shall be prima facie fair."

handedly with counsel for both parties, both of whose objections were sometimes sustained and sometimes overruled. The fact is that the defendant encountered greater intrinsic problems of proof in establishing its counterclaim than did the plaintiff in establishing his complaint.

There is no error.

In this opinion the other judges concurred.