[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case the plaintiff; Plainville Electric Products Company ("PEPCO"), seeks from the defendant, Louise Michaud, for Misappropriation of Business Opportunity Fiduciary Duty, and other causes of action[1]. After a trial to the court, the court finds the facts.
Facts
PEPCO is a Connecticut corporation which was founded in 1922. In the 1920's electricity for Yale University and provided stage lighting for theaters in New York C. began providing electrical panels for ships. During World War II virtually every ship in the United States Navy contained some electrical equipment supplied by PEPCO. After World War II PEPCO began making electrical control panels for machine tool businesses. By the early 1990's the demand from PEPCO's large customers CT Page 7909 such as New Britain Machine, The Stanley Company and Emhart had greatly decreased and PEPCO began to develop new business lines, which include providing electrical panels for Power Plants and Naval Simulators.
In 1993 PEPCO had $3,300,000 in sales. But, as a result of its cyclic financial performance as well as the downturn in military defense spending, PEPCO's business decreased in 1994. Its management determined it needed to seek out the design, manufacture and sale of a steady product line. It also determined that it needed to expend significant financial resources toward the design, manufacture and ultimately the sale of a digital fuel control for electrical turbine generators. This research and development project began in 1993. After expending significant amounts in research and development, PEPCO did design the fuel control, which was a major factor in PEPCO winning a large contract supplying the electrical controls for a municipal electrical utility in Higginsville, Missouri. PEPCO began distribution of the fuel control in early 1996.
Robert Sposato, the president of PEPCO, joined PEPCO in 1984 after his employment for approximately fifteen years as a systems engineer working on naval gun boats and systems for various divisions of United Technologies Corporation. In 1984 PEPCO's business was approximately one half military and one half commercial. Sposato's initial job duties were to oversee operations, which included purchasing, receiving, inspection, engineering, design and shop assembly. In 1993 Sposato bought out the other principals of PEPCO and became the president of the corporation.
The defendant, Louise Michaud, started working for PEPCO as the controller in 1991. Her starting salary was $50,000 per year. After six months she received a raise to $56,000 per year. During the period from December, 1993 through March 31, 1995 Michaud also received from PEPCO a childcare stipend in the amount of $200 per week. At various times during her employment with PEPCO Michaud received additional sums of money from that corporation which totaled in excess of $10,000. Those loans were referred to by both Sposato and Michaud as "loans," but were never repaid, having been forgiven by Sposato in January, 1996. PEPCO promoted Michaud to vice president and general manager in March of 1993 and increased her salary to $75,000 per year.
Michaud performed her various duties at PEPCO well and took on additional responsibilities during her time there. In 1991 she developed an employment agreement to be signed by all PEPCO employees. The initial purpose of the employment agreement was to prevent PEPCO's employees from stealing its trade secrets. Michaud first signed the employment agreement on October 10, 1991. After one of PEPCO's engineers left PEPCO to start his own business, Michaud added several paragraphs to the PEPCO CT Page 7910 employment agreement including:
 (7) I will, upon leaving the employ of PEPCO, return all Company material including, but not limited to, drawings, blueprints or other reproductions, computer programs, diskettes, confidential data, parts, tools or equipment and I will provide the Company with a signed and notarized affidavit stating that all Company material has been returned by me.
Michaud signed the amended version of the employment agreement on August 23, 1993.
In her Third Special Defense Michaud alleges that she signed the employment agreement with PEPCO "under duress and under fear of reprisal," and further alleges:
 The defendant having entered into a sexual relationship with the president several years prior to the execution of the [employment] contract and thereby giving the defendant the belief and understanding that signing said document was of no legal effect or consequence.
Michaud and Sposato did engage in a sexual relationship commencing in 1993 and continuing until July, 1994. However, Michaud presented no evidence to support the allegations of the foregoing special defense, or other special defenses in which she claims that Sposato forced her to sign an employment agreement. On the contrary, based on the testimony of Sposato and various documents introduced by the plaintiff, which had been authored by Michaud while she was employed at PEPCO, it appears that Michaud created both employment agreements, circulated them, explained their purpose to other employees of PEPCO, and signed them without any insistence at all from Sposato.
As of August of 1995 Sposato and Michaud were the "management team" of PEPCO. The nature of PEPCO's business required Sposato to travel frequently, sometimes for extended periods of time. Michaud handled all the financial affairs of PEPCO and was in charge of all PEPCO's affairs in Sposato's absence.
In August of 1995, PEPCO received a solicitation from Rocco Pezza, a business broker, concerning the possible acquisition by PEPCO of Bass Products Company ("Bass"). Mr. Pezza initially solicited PEPCO because a telemarketing survey identified PEPCO and Bass as having identical CT Page 7911 business codes. In that survey, companies had code designations which reflected the nature of their business. Both Bass and PEPCO were designated as code 3613, which identified them as manufacturers of electrical control devices. Bass was a Massachusetts corporation with its principal place of business in Salem, Massachusetts. Bass manufactured electrical control panels for recreational boats and panel trucks. The products made by Bass were not as complicated as those made by PEPCO, but there was a ready, widespread market for those products. In addition, Bass had a steady cash flow and PEPCO personnel could easily have produced and manufactured Bass products.
After PEPCO received the solicitation from Mr. Pezza, Sposato and Michaud agreed that they would invite Pezza to PEPCO's facility to discuss Bass. On August 21, 1995, Mr. Pezza met with Sposato and Michaud at PEPCO. At the meeting Michaud executed a Non-disclosure Agreement on behalf of PEPCO as to the Bass financial documentation. At the meeting Sposato and Michaud learned that Bass' manufacturing component occupied 7,000 square feet of space which could be relocated to PEPCO's Bristol facility, which had 7,000 square feet of vacant space. After the August 21, 1995 meeting, Sposato was very excited about the prospect of purchasing Bass. He saw that Bass was a manufacturer whose products were compatible with the PEPCO's business and that PEPCO could use its engineering expertise to further enhance the Bass product line. Sposato further thought that the acquisition of Bass by PEPCO would provide additional cost savings to both companies and would provide PEPCO with a much needed source of steady cash flow pending its development of new products. Immediately after the meeting with Rocco Pezza, Sposato directed Michaud to analyze the financial statement of Bass. By three o'clock in the afternoon Michaud had taken apart the Bass financial statement and reported to Sposato that Bass would generate about $350,000 cash flow per annum.
When he saw the foregoing projection Sposato definitely wanted PEPCO to attempt to acquire Bass. He asked Michaud to prepare a consolidated balance sheet, which she did. The consolidated balance sheet showed that if PEPCO and Bass consolidated all operations in one location, the entire venture would show a tremendous profit.[2]
Since Sposato had never purchased a business, he determined that PEPCO would need more information regarding the acquisition process. Therefore, Michaud invited representatives of Coopers Lybrand to PEPCO to discuss the acquisition. Those representatives indicated that the acquisition would need to take the form of a stock purchase and that purchase money financing from the seller would probably be available. After the meeting with Coopers Lybrand, Sposato directed Michaud to prepare a business plan for PEPCO's acquisition of Bass to be used to CT Page 7912 obtain financing for the acquisition. He also instructed Michaud to start to seek financing and take other steps necessary to PEPCO's acquisition of Bass. She told him she would do so.
Michaud took no action whatsoever on behalf of PEPCO's acquisition of Bass. On September 5, 1995, only two weeks after the initial meeting with Rocco Pezza, Michaud determined that she would attempt to purchase Bass herself and visited Bass in connection with her own purchase. Within a month after that date, Michaud had unilaterally decided that PEPCO would be financially unable to acquire Bass and had commenced serious efforts to purchase Bass for herself.
Sposato's knowledge of and consent to those efforts are a crucial element of Michaud's defense here. The parties presented conflicting evidence on this point. For reasons set forth below, the court finds that the evidence presented by PEPCO was more credible than that presented by Michaud.
Sposato testified that in December, 1995 he visited the offices of Bass in Salem, Massachusetts and met with Barnet Weinstein, the owner of Bass. Sposato advised Weinstein that if PEPCO purchased Bass, it intended to relocate the business to Bristol. His testimony to the contrary at trial notwithstanding, Mr. Weinstein never indicated that he would refuse to sell if Bass was relocated. Sposato left the meeting thinking that Michaud was still working on the purchase of Bass for PEPCO.
During the later part of 1995 Sposato was frequently out of Connecticut overseeing PEPCO's building of a large power plant in Higginsville, Missouri. Periodically he would ask Michaud how the acquisition of Bass was proceeding and she would assure him that it was proceeding well. However, in January of 1996 Michaud informed Sposato that Bass had been purchased by another buyer.
Michaud testified that in September of 1995 she advised Sposato that she was going to buy Bass herself, Sposato became angry, and she never broached the subject with him again. Michaud's subsequent conduct cast serious doubt on her claim that she had advised Sposato of her own intentions to acquire Bass. She kept her acquisition actions and plans secret from Sposato and told Rocco Pezza not to contact her at PEPCO because she did not want to work to acquire Bass for herself on PEPCO time.
By October, 1995, Michaud was using the PEPCO fax number to transmit financial information concerning her own acquisition of Bass to potential lenders. For example, on October 12, 1995 by "Fax Transmittal" on PEPCO's fax line, Michaud sent a letter to Industrial Services Program, an entity CT Page 7913 which provided financing to small industrial businesses, in which she stated: "I am in the process of securing funding to acquire a small manufacturing establishment in Salem, Mass." The letter gave Michaud's home address and stated that she should be contacted at her home telephone number after 5:00 p.m. By letter dated October 18, 1995 to William Kyriakis at industrial Services Program, Michaud enclosed extensive financial information from Bass, a five year business plan for Bass, as well as the following five year projections for Bass: Projected Statement of Profit and Loss; Projected Balance Sheet; Projected Statement of Cash Flow; Projected Manufacturing Overhead Expenses; Projected Selling Expenses; and Projected General and Administrative Expenses. The letter to Mr. Kyriakis also included a narrative projection which was dated October 10, 1995.
Sposato testified that sometime in late 1995 Michaud told him that she wanted to leave PEPCO to pursue other opportunities and she requested a letter of recommendation. Sposato wrote such a letter dated December 15, 1995 addressed to "Dear Sir or Madam." Michaud sent this letter to Barnet Weinstein in connection with her efforts to acquire Bass for herself. Sposato further testified that in July, 1996 two faxes came into PEPCO for Michaud. The first one concerned the purchase of a house in Massachusetts. When Sposato questioned Michaud about the house purchase, she said that the house was being purchased by her daughter. The second fax indicated that the purchase of the house was contingent on the purchase of a business. Michaud then admitted to Sposato that she, not her daughter, was buying the house, but the business mentioned was an auto parts business. The foregoing testimony by Sposato was not contradicted by Michaud. If Michaud had advised Sposato of her intentions to purchase Bass for herself; she certainly would not have had to lie to Sposato about the house and business referenced in the fax transmissions.
The plaintiff brought out a significant amount of information to impeach the credibility of Michaud. When Michaud applied to PEPCO she submitted a resume which indicated that she had a bachelor's degree from the University of Hartford. In the course of her testimony at trial admitted that not only did she have no bachelor's degree, but she had never even attended the University of Hartford. The resume also indicated that Michaud had been a corporate officer of White Oak Construction Company, a former employer. Although Michaud had worked for White Oak, she had never been a corporate officer. Michaud justified the false information on her resume as follows: when she created the resume she was in her 40's, was a single mother, and had good job experience, and she thought that fabricating a bachelor's degree and a corporate officer position would help her get a better job. Thus, Michaud established that she did not allow herself to be constrained by the truth, when a lie CT Page 7914 would further her career goals. In her Answers to the plaintiff's Interrogatories dated June 3, 1998, Michaud stated that she had provided financial information relating to PEPCO's acquisition of Bass to Fleet Bank, GE Capital and First National Bank of New England. See Ex. 66, Interrogatory 12. At trial she admitted that the foregoing answer was false. She had not provided financial information to any potential lenders in connection with PEPCO's acquisition of Bass. Michaud also readily admitted that she had failed to report to the Internal Revenue Service income in the approximate amount of $16,000 which she had received from PEPCO.
Based on the foregoing the court finds Michaud's testimony less than credible. The court finds that Michaud never told Sposato that she intended to purchase Bass for herself. Instead, while secretly working to purchase Bass on her own behalf, she continued to assure Sposato that she was working towards PEPCO's purchase of Bass.
Rocco Pezza and Barnet Weinstein were aware that Pezza had initially presented the Bass acquisition opportunity to PEPCO. They had some concern about their own complicity in Michaud's theft of corporate opportunity. Weinstein testified that this concern caused him to consult a lawyer. Weinstein further testified that he understood from conversations with Pezza that PEPCO was financially unable to purchase Bass. It is reasonable to infer that Pezza received this information from Michaud. Sposato was never aware of Michaud's intent to purchase Bass for herself and never consented to that purchase. Michaud never made any effort to obtain financing for a PEPCO purchase of Bass.
After negotiating with Weinstein and various lenders for over a year Michaud purchased Bass on November 5, 1996. The purchase was accomplished in the manner initially suggested to PEPCO by Coopers Lybrand: a stock acquisition by a newly formed corporation, Bass Acquisitions, Inc. with the seller providing significant financing. The final purchase price was $1,340,000 and came from two sources: a Small Business Administration ("SBA") guaranteed $600,000 loan from First National Bank of New England and a note in the amount of $740,000 from Bass Acquisitions, Inc., to Barnet Weinstein and Sandra Weinstein Charitable Remainder Trust (the actual seller of the stock of Bass) guaranteed by Louise Michaud. Michaud, who had no assets other than approximately $30,000 of equity in her house, purchased Bass by means of what was, essentially, a leveraged buyout in which the assets of the acquired corporation constituted the sole collateral for the loan.
Sposato first learned that Michaud had purchased Bass in December of 1996. He looked back at the federal express packages sent out to potential lenders during the period in which Michaud was supposed to have CT Page 7915 been securing financing for the PEPCO purchase of Bass and on Christmas Eve, 1996, sent federal express letters to all the recipients of those packages asking for a return of whatever documents had been sent to them by Michaud. He also checked Michaud's office computer and found no trace of any files relating to Bass. He determined that Michaud had not only erased all such files, but she had used a "wipe" program to ensure that no one at PEPCO could retrieve any computer files relating to Bass.
Discussion of Law
 First and Third Counts — Misappropriation of Corporate Opportunity andBreach of Fiduciary Duty
In Ostrowski v. Avery, 243 Conn. 355, 362, 703 A.2d 117 (1997), the Connecticut Supreme Court held that once a plaintiff has proven the existence of a corporate fiduciary relationship and a corporate opportunity, defendant corporate fiduciaries bear the burden of proving, by clear and convincing evidence, that they have not usurped a corporate opportunity. "An officer and director occupies a fiduciary relationship to the corporation and its stockholders." Katz Corp. v. T.H. Canty 
Co., 168 Conn. 201, 207, 362 A.2d 975 (1975).
The defendant does not dispute that a fiduciary relationship existed between her and PEPCO. Michaud was the vice-president, chief financial officer, a director, corporate secretary and general manager of PEPCO during 1995.
In determining whether a cause of action for usurpation of a corporate opportunity exists, the Supreme Court held that the dominant inquiry is whether the corporate opportunity at issue falls within the corporation's avowed business purpose. Ostrowski, supra, 367. The avowed business purpose test is a variant of the "line of business" test. This test requires an analysis of whether the opportunity is "closely associated with the existing and prospective activities of the corporation." Rosenblum v. Judson Engineering Corp., 99 N.H. 267, 273, 109 A.2d 558
(1954). The Ostrowski Court adopted a multi-factor analysis for assessing what activities fall within a corporation's line of business previously referenced in Miller v. Miller, 301 Minn. 207, 224-25, 222 N.W.2d 71
(1974).
The factors listed by the Court are:
 (1) whether the business opportunity was one in which the complaining corporation had an interest or an expectancy growing out of an existing contractual right; CT Page 7916
 (2) whether there was a close relationship between the opportunity and the corporation's business purposes and current activities; and,
 (3) whether the business areas contemplated by the opportunity were readily adaptable to the corporation's existing business, in light of its fundamental knowledge, practical experience, facilities, equipment, and personnel.
Ostrowski, supra, 366.
PEPCO has presented abundant evidence that the acquisition of Bass presented PEPCO with a significant corporate opportunity. Bass and PEPCO were both in the business of designing and manufacturing electrical control panels. PEPCO generally designed large complicated systems which often required PEPCO to expend substantial amounts of time and money on research and development, while Bass sold smaller less complex control panels for pleasure boats and trucks. In addition, PEPCO had unused space in its manufacturing facility which readily could have accommodated the Bass manufacturing operations. Due to the downturn in its defense industry business and the closing of large Connecticut manufacturers such as Stanley Works, and Fafnir Bearing, PEPCO was experiencing cash flow problems while it designed alternate products, such as its digital fuel control system. Bass had small products for which there was a ready market and would have provided a ready source of cash flow for PEPCO.
Based on the foregoing it is clear that the acquisition of Bass by PEPCO was not only "closely associated with the existing and prospective activities" of PEPCO, see Rosenblum v. Judson Engineering Corp., supra, 273, but it was perfectly suited to the situation of PEPCO at the time.
Since PEPCO has established the necessary predicates to liability for usurpation of corporate opportunity, the burden shifted to the defendant to establish by clear and convincing evidence, the fairness of her dealings with the corporation. See Ostrowski, supra, 362. In Ostrowski the Court stated:
 The most significant legal issue relating to the defendants' burden of proving fair dealing, a question of first impression for this court, pertains to the claim of usurpation of a corporate opportunity. In particular, what role does disclosure to other directors and shareholders play in determining whether a corporate opportunity in CT Page 7917 fact usurped? That question contains three sub-inquiries: (1) to whom should a corporate fiduciary make disclosure and what information must be communicated; (2) in the absence of an appropriate disclosure, can a corporate fiduciary interpose other defenses in order to avoid liability; and (3) if other defenses are available to the corporate fiduciary, in the absence of an appropriate disclosure, what does a corporate fiduciary have to prove in order to establish a good faith defense to a claim of usurpation of a corporate opportunity? In our view, these inquiries should be resolved in a manner that not only provides protection for corporation but also gives appropriate weight to the specific circumstances in which the corporate fiduciary and the corporation find themselves.
Id. at 368-369.
In most cases in which the courts have considered the usurpation of corporate opportunity including Ostrowski, the disclosure requirements pertain to disclosure of the opportunity itself. For example, in Ostrowski, the defendants had disclosed the existence of the opportunity to the majority shareholder, and the Court held that the disclosure was inadequate because it had not been made to the minority shareholders. 243 Conn. At 371. In this case the officers and directors of PEPCO, Sposato and Michaud, were well aware of the existence of the opportunity. The issue here is whether Michaud advised Sposato of her intention to pursue the opportunity herself. As set forth above, the court has found that Michaud never advised Sposato of that intention. Thus, in this case there was no disclosure by Michaud to Sposato.
In Ostrowski the Court reviewed the "three different approaches regarding the effect of such a disclosure or nondisclosure on the liability of such a fiduciary." 243 Conn. at 371. In one approach, espoused in § 5.05 of the American Law Institute's Principles of Corporate Governance: Analysis and Recommendations (1992) (Principles of Corporate Governance), the absence of disclosure unequivocally imposes liability on the fiduciary. See id. at 372. This approach has been followed by the courts of Maine and Oregon. Northeast Harbor Golf Club, Inc. v. Harris, 661 A.2d 1146, 1151-52 (Me. 1995); Klinicki v. Lundgren,298 Or. 662, 682-83, 695 P.2d 906 (1985). While the Court in Ostrowski declined to adopt this "bright line" test for fiduciary liability, it noted:
CT Page 7918 Commentators supporting a standard that makes disclosure mandatory and dispositive have noted that, "when the fiduciary decides that the corporation is financially unable to take the opportunity, he is substituting his own judgment for that of the board of directors or shareholders." D. Brown, supra, 28 Corporate Practice Commentator 516. The "[a]vailability of the defense of corporate incapacity reduces the incentive to solve corporate financing and other problems," and recognizes that evidence regarding the corporation's financial status is often within the control of the diverter. V. Brudney C. Clark, supra, 94 Harv.L.Rev. 1020-22. They argue that "the appropriate method to determine whether or not a corporate opportunity exists is to let the corporation decide at the time the opportunity is presented." 3 W. Fletcher, supra, § 861.10, p. 285; 1 A.L.I., Principles of Corporate Governance, supra, § 5.05, pp. 299-300, reporter's notes.
243 Conn. at 373, fn 14. Emphasis added.
In this case Michaud did more than substitute her judgment for that of the corporation with respect to PEPCO's financial ability to purchase Bass. She used her position as chief financial officer of PEPCO to thwart any attempt by that corporation to purchase Bass. Michaud now takes the position that PEPCO was financially unable to purchase Bass because it could not have obtained a loan. However, she was the one who was supposed to secure such a loan. She made no attempt to do so.
Michaud is a "diverter" of corporate opportunity referred to by the commentators cited in Ostrowski, supra, 373. See also V. Brudney C. Clark, 94 Harv.L.Rev. 1020-22. Brudney and Clark advocated the imposition of a bright line test whereby the usurper's failure to disclose the corporate opportunity prevents her from later defending her actions based on corporate financial inability because "evidence regarding the corporation's financial status is often within the control of the diverter."
The Ostrowski Court recognized a second approach to fiduciary liability which "focuses less on adequate disclosure by a corporate fiduciary and more on whether affirmative defenses, such as the corporation's financial inability to avail itself of the corporate opportunity at issue, can be proven by the corporate fiduciary." 243 at 374. This approach was "implicitly" the position that the Court took in Katz Corp. v. T. H. Canty CT Page 7919 Co., 168 Conn. 201, 210, 362 A.2d 975 (1975). Id.
The third approach referred to by the Ostrowski Court was the one taken by the Delaware Supreme Court in Broz v. Cellular Information Systems, Inc., 673 A.2d 148 (Del. 1996). See Ostrowski, supra, 375. The Court in Broz recognized that adequate disclosure was complete defense to a claim of usurpation of a corporate opportunity but declined to recognize that nondisclosure, per se, constituted a usurpation of corporate opportunity and permitted the fiduciary to defend on the grounds that the corporation had no interest, expectancy or financial ability. See id. at 375-376.
The Court in Ostrowski adopted the decision of the Broz court in that it held that adequate disclosure of a corporate opportunity is an absolute defense to fiduciary liability for alleged usurpation of such opportunity. See 243 at 376. It also held that in the absence of disclosure, a corporate fiduciary could still prove good faith by clear and convincing evidence by establishing that his or her conduct had not harmed the corporation. See id. at 377. The Court expanded on the Broz ruling by stating that "in assessing such harm[to the corporation by the fiduciary], the trier of fact must give special weight to the effect of nondisclosure on the corporation's entrepreneurial opportunities." See id. In this case Michaud's nondisclosure and misrepresentations eradicated PEPCO's entrepreneurial opportunity.
As stated above, under Ostrowski, a corporate fiduciary bears the burden of proving by clear and convincing evidence that she has not usurped a corporate opportunity. See id.
"[C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . ." Wildwood Associates LPD v. Esposito, 211 Conn. 36, 42, 557 A.2d 1241 (1989). The clear and convincing standard is met only if "the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, and that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Emphasis in original; internal quotation marks omitted.) Charlton v. Commissioner of Correction, 51 Conn. App. 87, 90, 719 A.2d 1205
(1998); see also State v. Bonello, 210 Conn. 51, 66, 554 A.2d 277, cert. denied, 490 U.S. 108, 109 S.Ct. 3268, 106 L.Ed.2d 612 (1989); Wildwood Associates, supra, 42. We are mindful that "[t]his standard of proof should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) Lopinto v. Haines,185 Conn. 527, 539, 441 A.2d 151 (1981); Somers v. Statewide Committee, CT Page 7920245 Conn. 277, 291, 715 A.2d 712 (1998).
The Ostrowski decision held that it is the corporate fiduciary, not the complainant, who must establish, as an affirmative defense, that the corporation lacked the financial ability to avail itself of a corporate opportunity. Ostrowski, supra, 380 (footnote 9).
Virtually all the evidence presented by the defendant was directed to the Fifth, Ninth and Tenth Special Defenses which allege in various ways that PEPCO would have been financially unable to purchase Bass. For the reasons set forth below, the court finds that the defendant has failed to sustain her burden of proof under either the clear and convincing standard applicable in this case, or even the preponderance of the evidence standard.
The major theme of the defendant's claim of financial inability was that PEPCO had cash flow problems which included claims by creditors in the approximate amount of $60,000 and these problems would have prevented PEPCO from obtaining financing to purchase Bass. The flaw in this theme is that Michaud was able to purchase Bass with virtually no assets, no experience as the owner of business and no professional degree in electrical engineering. Her purchase was based on the strength of the value of Bass assets alone and amounted to a leveraged buy-out where the assets of Bass constituted the sole collateral for the SBA guaranteed loan and the purchase money financing provided by Mr. Weinstein.
PEPCO admittedly had cash flow problems. Those problems constituted the primary reason why the purchase of Bass was such a good opportunity. The cash flow problems of PEPCO did not prevent it from being a viable company. It was an established business which was capable of and had generated millions in gross sales. PEPCO's president had substantial assets as compared with those of Michaud. He also had an engineering degree, had owned his own business for eleven years and, unlike Michaud, had an income outside of any income he would need to derive from Bass. These attributes would have made Sposato a much better loan risk than Michaud. Contrary to the picture of PEPCO which the defendant tired to paint, PEPCO was not a business in financial shambles, and showed a substantial profit just several years after Michaud acquired Bass.
Michaud set up an acquisition company to acquire Bass. Clearly PEPCO could have done the same thing, thereby insulating the Bass assets and cash flow from PEPCO's creditors.
Finally, while Michaud claimed PEPCO would have been unable to obtain a loan to purchase Bass, the evidence was that PEPCO had obtained a loan in the amount of $465,000 in 1996, prior to the time Michaud obtained her CT Page 7921 loan to purchase Bass. PEPCO's 1996 loan was obtained on the strength of PEPCO's financial statement alone. Clearly, if PEPCO had been able to use the assets and attractive cash flow of Bass as collateral, it could have obtained financing to purchase Bass.
Based on all the testimony of Barnet Weinstein presented at trial[3]
the court finds that he wanted to retire, he had been looking for a buyer for Bass for several years and had obtained no viable offers. He obtained no other offers, except from Michaud, during the period between September, 1995, when Mr. Pezza first contacted PEPCO about the purchase of Bass, and November, 1996, when Michaud acquired Bass. But for Michaud's misappropriation of the opportunity, PEPCO would have been the only buyer for Bass and it is probable that Mr. Weinstein would have sold Bass to PEPCO.
Michaud did not testify during the defendant's case in chief. Therefore, the only evidence presented in support of the special defenses which did not involve a claim of financial inability was presented in the form of cross examination of the plaintiffs witnesses, including Michaud. That evidence was insufficient to establish any of the special defenses by clear and convincing evidence.
In her first four special defenses the defendant refers to Sposato's "sexual harassment" of Michaud. Traditionally a claim for sexual harassment under federal law or state law has proceeded "on one of two theories: (1) quid pro quo e.g., favorable treatment in return for sought sexual favors or (2) hostile work environment." Gallagher v. Delaney,139 F.3d 338, 346 (2nd Cir. 1998); see Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633
(1998). Brittell v. Department of Correction, 247 Conn. 148, 165-166,717 A.2d 1254 (1998). The defendant does not use the term "sexual harassment" in the foregoing sense. Rather, she alleges that after she ended the sexual relationship with Sposato,
 the plaintiff continued to annoy, harass and otherwise badger the defendant and continually implored the defendant to renew her relationship with the president and being continually rejected by the defendant, the plaintiff, acting through its president, has brought this complaint motivated by its president's motive of revenge.
First Special Defense.
Although there was evidence that Sposato liked to have lunch with Michaud, walked her to her car after work, and that he called her at home CT Page 7922 frequently, the defendant presented no evidence that Sposato badgered, annoyed or harassed her. Moreover, the plaintiff's motive for bringing this suit has no relevance to the defenses except insofar as the motive may tend to establish that the plaintiff consented to Michaud's purchase of Bass or that the plaintiff was unable to take advantage of the opportunity. As stated above, the defendant has failed to establish that PEPCO consented to Michaud's purchase of Bass or that PEPCO was financially or otherwise unable to purchase Bass.
The defendant did introduce one piece of evidence that tended to prove PEPCO's ratification of Michaud's purchase of Bass. This was a copy of a fax transmission sent by Sposato to Michaud at Bass on December 20, 1996 (Defendant Exhibit E) in which Sposato gave Michaud some business product information and stated, "I always told you I would help you any way that I can and I am still your best friend." Did this letter constitute ratification by PEPCO of Michaud's purchase of Bass or was it merely Sposato allowing his personal feelings for Michaud to cause him to temporarily overlook Michaud's theft of corporate opportunity? As stated in more detail above, there was a significant amount of evidence to support the conclusion that Sposato believed that Michaud was working towards a PEPCO purchase of Bass and was not aware of Michaud's intent to purchase Bass for herself until after the purchase occurred. In the absence of any evidence other than Exhibit E to support ratification, the court finds that that document was insufficient to enable the defendant to satisfy her burden of proving PEPCO's consent or ratification by clear and convincing evidence, or even by a preponderance of the evidence.
In the Second, Third and Fourth Special Defenses the defendant alleges that her relationship with Sposato nullifies the employment agreement that she signed. As set forth above, there was no evidence presented to support the allegations in those special defenses. Moreover, the existence of the two employment agreements signed by Michaud are irrelevant to the plaintiff's major claims here: usurpation of corporate opportunity and breach of fiduciary duty.
Second Count — Breach of Contract:
As stated above Michaud executed two employment contracts with PEPCO. Plaintiff's Exhibits 8 (1991 Contract) and 10 (1993 Contract). The 1993 Contract provides in pertinent part:
 (2) [she would] not, at anytime, disclose to anyone other than authorized officers or representatives of PEPCO or make use of information or knowledge relating to PEPCO's business, manufacturing methods, processes, techniques, products or research obtained CT Page 7923 by [her] while in the employ of PEPCO which shall not be generally known to the public or recognized as standard practices, and on leaving the employ of PEPCO, [would] not take with [her], without its written consent, any drawing, blueprint or other reproduction, computer program, diskettes, confidential data, parts, tools or equipment.
 (3) [she] recognize[d], further, that all records, customer lists, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to PEPCO's operations, activities or business, made or received by [her] during any period of [her] employment with PEPCO are and shall be the property of PEPCO exclusively, and [she] will keep the same, at all times, subject to its control and will surrender the same at the termination of [her] employment, if not before.
 (6) [she] will not, at any time while in the employ of Plainville Electrical Products Company, participate or consult, in another business interest, publicly or privately, whose general practice or product is similar in concept to the capabilities of Plainville Electrical Products Company. . . .
 (7) [she] will, upon leaving the employ of PEPCO, return all Company materials including, but not limited to, drawings, blueprints or other reproductions, computer programs, diskettes, confidential data, parts, tools or equipment and [she] will provide the Company with a signed and notarized affidavit stating that all Company material has been returned by [her]."
Michaud breached the above terms of her employment contract. She took for her own personal use information provided to PEPCO as part of the solicitation by Bass for its sale. She further developed an understanding of how to pursue an acquisition of Bass from her participation in the meeting between PEPCO and Coopers Lybrand. Michaud took this information that clearly "related to PEPCO's business" and used it for her own purposes.
Further, Michaud "participated and consulted with another business interest" while she was employed with PEPCO in that she attempted to acquire Bass while she continued to be employed by PEPCO. CT Page 7924
Michaud has also violated her employment contract based on her theft of PEPCO computer equipment and PEPCO engineering and design drawings. Although there was conflicting testimony on this point, the court finds that Michaud misappropriated the "B" copies of PEPCO's engineering and design drawings before she left PEPCO, and retained computer equipment which she received from PEPCO. The court finds in favor of the plaintiff on the Second Count of the Complaint.
Fourth and Fifth Counts — Fraud and Negligent Misrepresentations
"[The essential elements of an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." Kilduff v. Adams, Inc., 219 Conn. 314, 329,593 A.2d 478 (1991); Maturo v. Gerard, 196 Conn. 584, 587, 494 A.2d 1199
(1985); Paiva v. Vanech Heights Construction Co., 159 Conn. 512, 515,271 A.2d 69 (1970); Clark v. Haggard, 141 Conn. 668, 673, 109 A.2d 358
(1954); Helming v. Kashak, 122 Conn. 641, 642-643, 191 A. 525 (1937); Bradley, v. Oviatt, 86 Conn. 63, 67, 84 A. 321 (1912); Barnes v. Starr,64 Conn. 136, 150, 28 A. 980 (1894).
In Kilduff v. Adams, supra, 330, the Connecticut Supreme Court held that the plaintiffs in a fraud action were required to prove their damages by a preponderance of the evidence and to prove all the other elements of fraud by clear and satisfactory evidence.
The court finds that Michaud made the following major misrepresentations: 1) she advised Sposato repeatedly that she was actively seeking financing for PEPCO's acquisition of Bass; and 2) she advised Sposato in early 1996 that Bass was no longer for sale because it had been purchased by a third party.
PEPCO relied on each of these misrepresentations to its detriment. Had Sposato known that Michaud was trying to purchase Bass for herself; he could have caused PEP CO to prevent her from doing so and to make a real attempt to purchase Bass itself. As a result of the above misrepresentations, PEPCO was effectively denied the acquisition of Bass.
Fraud by nondisclosure involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak. Parker v. Shaker Real Estate, Inc., 47 Conn. App. 489,494, 705 A.2d 210 (1998); Gelinas v. Gelinas, 10 Conn. App. 167, 173,522 A.2d 295, cert. denied, 204 Conn. 802, 525 A.2d 965 (1987). CT Page 7925
Ms. Michaud failed to disclose the following facts despite her duty to do so:
1. She intended to purchase BASS individually and for her own personal financial gain;
2. She was seeking financing for her own purchase of Bass;
3. She was disseminating the information contained within the Bass financial records to obtain financing for her purchase of Bass; and
4. She had done nothing in furtherance of PEPCO's purchase of Bass.
There is no question that Michaud had a duty to disclose all pertinent fact regarding PEPCO'S potential acquisition of BASS. As director and corporate officer, Michaud had the duty to exercise utmost good faith and fair dealing in all of her dealings with PEPCO. See Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 407, 456 A.2d 325
(1983); Ferris v. Polycast Technology Corp., 180 Conn. 199, 208-09,429 A.2d 850 (1980).
Michaud made the misrepresentations in an effort to induce PEPCO's reliance so that she could proceed with her plan to misappropriate the Bass purchase opportunity without PEPCO's interference or "competition." PEPCO proved by substantial, clear and convincing evidence that Michaud utilized a fraudulent scheme of misrepresentations and nondisclosure to steal PEPCO's corporate opportunity to buy Bass. Therefore, the court finds in favor of the plaintiff on the Fourth Count of the Complaint.
The plaintiffs brief indicates that the claim for negligent misrepresentation in the Fifth Count of the Complaint was made in the alternative in the event that the court did not find that the defendant's conduct rose to the level of intentional misrepresentations. Since the court has found that Michaud is liable for intentional misrepresentation, there is no need to consider the allegations of the Fifth Count of the Complaint.
Sixth Count — Civil Theft
Connecticut General Statutes Section 52-564 provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." Statutory theft under § 52-564 "is synonymous with larceny under General Statutes § 53a-119." Discover Leasing, Inc. v. Murphy, 33 Conn. App. 303,309, 635 A.2d 843 (1993) citing Lauder v. Peck, 11 Conn. App. 161, 165, CT Page 7926526 A.2d 539 (1987). Pursuant to § 53a-119 (Cum. Supp.), "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." The plaintiff is entitled to recover treble damages under if that § 52-564 for the value of the computer equipment wrongfully retained by Michaud. The court finds that that equipment had a value of $3938 and, therefore, awards the plaintiff judgment on this count in the amount of $11,814. The plaintiff is also entitled to an award of treble damages for Michaud's theft of the engineering and design drawings. However, the plaintiff presented no evidence from which the court can determine a value for those items.
Damages
If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself; the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefits and profits. Katz Corporation v. T.H. Canty Co., 168 Conn. 201, 209, 362 A.2d 975
(1975). In circumstances where "the interests of a corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself; and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired." Katz, supra, 209, quoting Guth v. Loft, Inc., 23 Del. Ch. 255, 272, 5 A.2d 503
(1939).
In any civil action, the plaintiff may include in his complaint claims for both legal and equitable rights. Connecticut General Statutes §52-97. A plaintiff is entitled to pursue its remedy at law, or to pursue its remedy in equity, or to pursue both. The doctrine permitting both remedies, or a combination thereof; is grounded in equitable principles permitting procedural flexibility while at the same time prohibiting double recovery. See Wendell Corporation Trustee v. Thurston,239 Conn. 109, 118, 680 A.2d 1314 (1996); Hartford National Bank Trust Co. v. Kotkin, 185 Conn. 579, 581-82, 441 A.2d 593 (1981).
A constructive trust may be imposed "against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." Spatola v. Spatola, 4 Conn. App. 79, 81, 492 A.2d 518 (1985). "Before a constructive trust can be created . . . there must be a duty owed, or a fiduciary or otherwise special relationship between the parties." CT Page 7927 Filosi v. Hawkins, 1 Conn. App. 634, 639, 474 A.2d 1261 (1984).
The plaintiff presented substantial evidence of damages under a number of scenarios. Greg Gorski[4], the accountant for PEPCO, used actual financial statements of PEPCO and Bass and projected the income of the combined operation of Bass and PEPCO under various scenarios and then subtracted the projected income of PEPCO alone to arrive at a figure for past damages. The court finds that the most probable scenario was one in which the combined PEPCO and Bass operation was located in Bristol. The court finds that the plaintiff sustained damages of past lost profits in the amount of $1,920,576.
It is clear that Michaud was a fiduciary with respect to PEPCO and in violation of that duty acquired ownership and control of Bass. Michaud's continued ownership of Bass denies PEPCO the profit and benefits of such ownership and allows her to profit from her fraudulent conduct. Therefore, the imposition of a constructive trust until such time as Michaud transfers her complete interest and ownership in Bass to PEPCO is the appropriate remedy to restore PEPCO to the position it would have been in if Michaud had not usurped PEPCO's corporate opportunity.
The court hereby ORDERS that the defendant, Louise Michaud, within 90 days of the date hereof; convey the assets, and stock of Bass Products Company and Bass Products Acquisition Company, Inc. to PEPCO. Pending that transfer, the court orders that a constructive trust is hereby imposed on the assets, income and stock of Bass Products Company and Bass Products Acquisition Company, Inc.
The court hereby further ORDERS that Louise Michaud refrain from transferring, selling or encumbering Bass Products Company or Bass Products Acquisition Company, Inc., the stock of those corporations or any assets owned by those corporation in any way prior to complete transfer of the ownership of those corporations.[5]
Punitive Damages
Common law punitive damages may be awarded in a fraud action. See, e.g., O'Leary v. Industrial Park Corp., 211 Conn. 648, 651, 560 A.2d 968
(1989); Brower v. Perkins, 135 Conn. 675, 680-81, 68 A.2d 146 (1949). Common law punitive damages are measured by the actual expenses of litigation including the attorney's fees. This may include the costs incurred pursuant to a contingent fee agreement. See, e.g. Markey v. Santangelo, 195 Conn. 76, 80, 485 A.2d 1305 (1985). A trial court has broad discretion in determining whether damages are appropriate. Buckman v. People Express, Inc., 205 Conn. 166, 175, 530 A.2d 596 (1987). CT Page 7928
At trial the plaintiff submitted ample evidence to demonstrate Michaud's fraudulent misrepresentations concerning her acquisition of Bass.
PEPCO submitted evidence as to the costs it sustained in prosecuting this case. Those costs total $18,326.30. In addition, PEPCO submitted evidence that it had entered into an agreement which provided for its payment of attorney's fees contingent on the amount of the recovery.
In addition to the damages for past lost profits in the amount of $1,920,576 and for treble damages for theft of computer equipment in the amount of $11,814, the court hereby awards the plaintiff punitive damages in the amount of $370,402.30, which number is comprised of the contingent fee of $352,076 and costs in the amount of $18,326.30. The total amount of all damages awarded to PEPCO is, therefore, $2,302,792.30. Judgment in that amount is hereby entered against the defendant, Louise Michaud, in favor of the plaintiff, Plainville Electrical Products Company.
By the court,
 _________________ Aurigemma, J.